1

# DAN A. DRUZ

*Attorney at Law*
291 E. Main St.
Suite 1000
Manasquan, New Jersey 08736
Tel: 732 223-7676 *** Fax: 732 223-1592

VIA OVERNIGHT MAIL SERVICE

August 17, 2007

FINRA Dispute Resolution
One Liberty Plaza, 27th Fl.
165 Broadway
New York, NY  10006

Re:   Greg Capra et al. v. Oliver Velez (CRD# 3264135)
      FINRA Dispute Resolution

Dear Ms. / Sir:

I represent the claimants.  Please find enclosed herewith five copies of the Statement of Claim for commencement of an arbitration proceeding.  A copy of the executed Uniform Submission Agreement is being sent under separate cover.  Please invoice me for the proper filing fee, or contact me at 732 822-1052, and I will forward it to you immediately.

Address for service on Respondent Velez is:
Oliver L. Velez
14 Richbell Rd.
White Plains, NY  10605.

I have simultaneously forwarded to him a courtesy copy of this letter and the Statement of Claim.

Very truly yours,

cc:    Oliver Velez

# DAN A. DRUZ

*Attorney at Law*
291 E. Main St.
Suite 1000
Manasquan, New Jersey 08736
Tel: 732 223-7676 *** Fax: 732 223-1592

VIA OVERNIGHT MAIL SERVICE

August 17, 2007

FINRA Dispute Resolution
One Liberty Plaza, 27th Fl.
165 Broadway
New York, NY  10006

Re:    Greg Capra et al. v. Oliver Velez (CRD# 3264135)
       FINRA Dispute Resolution

Dear Ms. / Sir:

    I represent the claimants.  Please find enclosed herewith five copies of the Statement of Claim for commencement of an arbitration proceeding.  A copy of the executed Uniform Submission Agreement is being sent under separate cover.  Please invoice me for the proper filing fee, or contact me at 732 822-1052, and I will forward it to you immediately.

    Address for service on Respondent Velez is:

Oliver L. Velez
14 Richbell Rd.
White Plains, NY  10605.

I have simultaneously forwarded to him a courtesy copy of this letter and the Statement of Claim.

Very truly yours,

cc:    Oliver Velez

FINRA DISPUTE RESOLUTION

In the Matter of the Arbitration between

GREG CAPRA AND PRISTINE CAPITAL
HOLDINGS INC.,

                 Plaintiffs,

and                                  STATEMENT OF CLAIM

OLIVER L. VELEZ,

                 Respondent.

---

     Plaintiffs Greg Capra and Pristine Capital Holdings, Inc., through the undersigned attorney, by way of Complaint against Respondent Oliver Velez, state as follows:

## Parties

    1.     Plaintiff Greg Capra is one of the co-founders of Pristine Capital Holdings, Inc., ("PCH"), as well as a forty-seven (47) percent shareholder. He is currently PCH's President and CEO. At various relevant times herein, he was a registered principal of Pristine Securities LLC d/b/a Mastertrader.com ("MTC"), the broker-dealer subsidiary of PCH, and a FINRA member firm.

    2.     Plaintiff PCH is a Delaware corporation with its principal place of business located at 7 – 11 Broadway, Suite 210, White Plains, New York 10601. It has two wholly owned subsidiaries, one of which is denominated Pristine Services Inc ("PSI"), and the other is MTC.

FINRA DISPUTE RESOLUTION

In the Matter of the Arbitration between

GREG CAPRA AND PRISTINE CAPITAL
HOLDINGS INC.,

                        Plaintiffs,

and                                                    STATEMENT OF CLAIM

OLIVER L. VELEZ,

                        Respondent.

---

Plaintiffs Greg Capra and Pristine Capital Holdings, Inc., through the undersigned

attorney, by way of Complaint against Respondent Oliver Velez, state as follows:

### Parties

1.      Plaintiff Greg Capra is one of the co-founders of Pristine Capital Holdings,

Inc., ("PCH"), as well as a forty-seven (47) percent shareholder. He is currently PCH's

President and CEO. At various relevant times herein, he was a registered principal of Pristine

Securities LLC d/b/a Mastertrader.com ("MTC"), the broker-dealer subsidiary of PCH, and a

FINRA member firm.

2.      Plaintiff PCH is a Delaware corporation with its principal place of business

located at 7 – 11 Broadway, Suite 210, White Plains, New York 10601.    It has two wholly

owned subsidiaries, one of which is denominated Pristine Services Inc ("PSI"), and the other

is MTC.

registered principal with MTC, the broker-dealer subsidiary of PCH.  He is presently the CEO of Velez Capital Management LLC ("VCM").

4.      VCM is a New York limited liability corporation, with principal offices located at 130 West 42nd Street, Suite 450, New York, NY 10036.

### Facts

5.      Plaintiff, through one of its subsidiaries, provides educational support and information services to active securities traders via the internet, seminars, publications, and DVDs and is considered to be a leader in the securities education industry.

6.      Combined, these services are known to clients and to the public by the registered service marks and trademarked sales, marketing and educational process – "The Pristine Method®" ("TPM®").

7.      For more than ten years, Velez had been the "face" of the company.  On November 20, 2006, however, Respondent Velez was relieved of his executive duties as Chairman and CEO and removed as an officer and director as a result of his conversion of more than $250,000.00 of corporate funds to his personal use.

8.      He was later terminated on February 21, 2007 by PCH for breaches of fiduciary duty, a number of major violations of company policy, including, but not limited to, the conversion of funds; removing, disclosing and using PCH intellectual property without permission; and for surreptitiously commencing the formation of his new company, VCM, that would directly compete against PCH.

9.      No later than in November of 2006, after he was relieved of his executive

2

registered principal with MTC, the broker-dealer subsidiary of PCH. He is presently the CEO of Velez Capital Management LLC ("VCM").

4.    VCM is a New York limited liability corporation, with principal offices located at 130 West 42nd Street, Suite 450, New York, NY 10036.

<u>Facts</u>

5.    Plaintiff, through one of its subsidiaries, provides educational support and information services to active securities traders via the internet, seminars, publications, and DVDs and is considered to be a leader in the securities education industry.

6.    Combined, these services are known to clients and to the public by the registered service marks and trademarked sales, marketing and educational process – "The Pristine Method®" ("TPM®").

7.    For more than ten years, Velez had been the "face" of the company. On November 20, 2006, however, Respondent Velez was relieved of his executive duties as Chairman and CEO and removed as an officer and director as a result of his conversion of more than $250,000.00 of corporate funds to his personal use.

8.    He was later terminated on February 21, 2007 by PCH for breaches of fiduciary duty, a number of major violations of company policy, including, but not limited to, the conversion of funds; removing, disclosing and using PCH intellectual property without permission; and for surreptitiously commencing the formation of his new company, VCM, that would directly compete against PCH.

9.    No later than in November of 2006, after he was relieved of his executive

10.    Although he was relieved of his executive duties in November of 2006, he was still employed by PCH through February 21, 2007. During that time, Velez and the company were negotiating the repayment of the stolen funds and Velez's future role with the firm.

11.    Velez was not negotiating in good faith, however. Contemporaneous with the discussions, the purpose of which was to rehabilitate Respondent Velez as to his future role with the firm, he was surreptitiously creating VCM.

12.    To fulfill the objective of forming VCM, he registered two websites, one on December 20, 2006 and another on February 14, 2007, while still in the employ of PCH.

13.    A primary source of PCH's revenues is the distribution and sale of seminar presentations conducted live on site and via the internet, and recorded on DVDs and other electronic media.

14.    With the benefit of hindsight, it is now clear that soon after he was relieved of his executive duties as CEO of the company in November, 2006, Velez surreptitiously began collecting and copying confidential information, such as customer lists, the electronic files of the referenced seminars, and other company confidential material and intellectual property, for his illicit use in creating VCM.

15.    By January, 2007, if not earlier, and while still in the employ of PCH, Velez was also secretly developing relationships with other companies, which he claimed were for the benefit of PCH.

16.    Further, he ignored the insistent requests of other PCH executives that he not develop associations with certain individuals whose reputation was inconsistent with PCH's

10.     Although he was relieved of his executive duties in November of 2006, he was still employed by PCH through February 21, 2007. During that time, Velez and the company were negotiating the repayment of the stolen funds and Velez's future role with the firm.

11.     Velez was not negotiating in good faith, however. Contemporaneous with the discussions, the purpose of which was to rehabilitate Respondent Velez as to his future role with the firm, he was surreptitiously creating VCM.

12.     To fulfill the objective of forming VCM, he registered two websites, one on December 20, 2006 and another on February 14, 2007, while still in the employ of PCH.

13.     A primary source of PCH's revenues is the distribution and sale of seminar presentations conducted live on site and via the internet, and recorded on DVDs and other electronic media.

14.     With the benefit of hindsight, it is now clear that soon after he was relieved of his executive duties as CEO of the company in November, 2006, Velez surreptitiously began collecting and copying confidential information, such as customer lists, the electronic files of the referenced seminars, and other company confidential material and intellectual property, for his illicit use in creating VCM.

15.     By January, 2007, if not earlier, and while still in the employ of PCH, Velez was also secretly developing relationships with other companies, which he claimed were for the benefit of PCH.

16.     Further, he ignored the insistent requests of other PCH executives that he not develop associations with certain individuals whose reputation was inconsistent with PCH's

17.    Contrary to these instructions, Velez proceeded to promote a joint seminar with a company of poor reputation in the "prop" trading industry ("HLV Trading"). When confronted by PCH management at that time, Velez intentionally deceived them by falsely claiming that the advertised event was for the exclusive benefit of PCH, when in fact the purpose of the seminar was the launching of VCM, Velez's new venture and future competitor of PCH.

18.    It is incontestable that Velez's actions were in breach of his fiduciary duties and his duty of loyalty to PCH, of which he presently continues to be a 47% owner.

19.    As demonstrated by emails sent by a company Vice-President to Velez on February 12, 2007, in which the executive complained to Velez that his inexplicable, bizarre, public association with a securities industry entity of dubious reputation, was causing confusion and discomfort among PCH staff and its customers:

> "[Our customers and employees] see HLV [the entity of ill repute referenced *supra*] commercials on CNBC for you doing a seminar with [a potential competitor] and wonder what the hell is going on. You tell us that it's nothing to worry about because you are "just" doing a book signing and will only be there for the last 5 minutes. Well I find it hard to believe that HLV is going through all this marketing just for 5 minutes of your time to sign books. There is no mention of any book signing.... It's marketed as a seminar that you are doing and they removed all links [from the HLV website] to Pristine. On top of all that, [our employees] are all in the dark about this. No one was informed about this. We have to find out about it via our clients. But not only that, you proceeded to set this up in a clandestine manner.

20.    In fact, despite Velez's unequivocal denials, his presence at the HLV seminar held at the New York On-Line Traders Expo (February 17 – February 20, 2007) – the

4

heavily promoted and advertised by HLV on February 8 and February 9, 2007 on the HLV website's home page and via television commercials on CNBC, while Velez was still employed by PCH.

21.     The objectionable seminar took place on February 18, 2007 as advertised. When PCH employees attempted to attend in order to observe Velez's role at the presentation, they were physically blocked from entering the room.  Their exclusion was for reasons that later became obvious.  Velez was using the venue to launch his new company, VCM.

22.     Accordingly, Velez was immediately terminated, by letter dated  February 21, 2007.

23.     Because Velez had been a licensed principal of MTC, and because of the nature of his termination, in time it triggered a mandatory, internal regulatory review and related filings with FINRA.

24.     The seminar event, in concert with the previous discovery of the conversion of a quarter million dollars in corporate funds to his personal use, which included lavish dinners, and illicit, substantial cash advances against his Corporate American Express Card at "strip clubs" (Exh. "1"), were the precipitating, but not the only factors that resulted in Velez's termination.

25.     In response to his termination, Velez clearly indicated his mistaken belief that the proprietary information and materials underlying "The Pristine Method®" belonged to him, and that he could use them as he saw fit.

26.     Contemporaneous with his termination from PCH, Velez was illicitly inducing certain key employees of PCH     R   t

27.    On or about 2/14/07 Velez hired Ortiz for his new venture, prior to Velez's termination with PCH. On or about 3/30/07 Velez hired Lange. On or about 4/25/07, Velez hired Cina. A present review of Velez's, Ortiz's and Cina's actions between December of 2006 and March of 2007, clearly indicates that the three were conspiring around that time regarding their exit strategy, even before Velez was terminated.

28.    Except for the date of execution, the former employees' employment contracts were identical, and contained explicit restrictive covenants – non-compete, non-solicitation, and non-disclosure clauses at Paragraphs 3,4,5, and 6 thereof (Exhibit "2").

29.    Velez induced all of the former employees to breach their employment contracts, and in particular, the restrictive covenants. Further, there can be no doubt that he was completely conversant with the terms of their contracts, as he was the PCH executive who had originally signed them.

30.    In the course of their employment, Velez and the former employees had unfettered access to PCH's customer lists and other confidential and proprietary information. The materials taken by Velez and the key former employees, included critical information regarding its customers, specifically contact information, and a description of their needs and preferences for marketing purposes.

31.    The information was confidential and belonged exclusively to PCH, which had compiled it over many years, and at significant cost. It comprised vital marketing and competitive information that could cause grave damage to PCH, if placed in a competitor's hands, as Velez and the former employees have done.

32.    After the New York coming in F t         c 000m

development of a website, key sections of which were copied directly from PCH's. Using a similar format, VCM showcased a management team that previously appeared on PCH's internet site, with repeated references to PCH. In identical fashion to PCH, it also promoted on site and on line seminars, on site trading "labs", a live internet trading chat room, DVDs and other publications that together constitute the marketing of The Pristine Method®.

33.    Also prior to his termination, Respondent Velez indicated that he was planning a seminar to be held in the first week of April, 2007 in Washington, D.C., under the auspices of PCH. Then, after his termination, Velez deceptively usurped this PCH corporate opportunity, and made the presentation in conjunction with other corporate interests.

34.    Most of PCH's customers initially learn the securities trading process and methodology known as the "The Pristine Method®," by attending seminars. The basics of the process are presented through a lengthy "Power Point" presentation, which consists entirely of materials that are subject to registered service marks, trademarks and copyrights.

35.    PCH offers two different seminars for different levels of expertise. Respondents Velez and VCM have fully co-opted one of the two presentations – the introduction to "The Pristine Method®". Indeed, in the manual provided to VCM seminar subscribers, which Velez has denominated "Trade for Life", approximately two thirds of the written presentation consists of charts lifted directly from the manual that is used by PCH to introduce "The Pristine Method®" to new clients.

36.    According to VCM's website, the next and most audacious step until that time, in Velez's brazen plan to ruin PCH, took place in San Diego, California, at the San Diego

7

deploy the stolen intellectual property previously made public at the New York Online

Traders Expo, and other PCH property as well.

37.    Notwithstanding their agreement with PCH and Velez not to compete, solicit

and/or disclose, the former employees participated in the San Diego event too.

38.    Velez's actions have caused disruption and confusion among PCH's staff, its

client base, lists of which Velez illicitly spirited out of the firm prior to his termination, and

among the public. His acts have lessened corporate morale, and in addition to the former

employees' departure, one other important employee has left PCH. These departures from

PCH have caused substantial damages, and in a small company like PCH, with less than

twenty professionals on staff in its educational subsidiary at the beginning of 2007, a 25%

loss in key employees is an extraordinary one.

39.    On Velez's website, and in his promotional materials, he brags:

> "His 'Trade for Life' seminars and five day live trading
> sessions have been attended by more than 60,000 traders all
> over the world...."

The statement typifies the deceptive trade practices and false advertising that he and his new

company, VCM, have adopted. Velez has not presented to even one thousand people in

person since he departed PCH, much less 60,000 people. In fact, it was the PCH

organization and its team of instructors who accomplished that feat over the last decade,

using the "The Pristine Method®", not the newly spawned "Trade for Life" ripoff that Velez

is presently relying upon.

40.    This intentionally confusing statement is an illicit attempt to exploit the

goodwill and registered service marks of "TPM®". Also, by creating a website and

manner, Velez further contributes to confusion among the public, especially the part that constitutes PCH's customer base.

41.     Velez has also interfered with PCH's advantageous business relations, particularly with its publisher, who, as a result of misleading statements and pressure by Velez, placed a moratorium on the publishing and promoting of certain PCH merchandise that had been recently produced, at significant expense to Plaintiffs; and with MTC's regulator, FINRA, by refusing to cooperate with MTC in making its mandatory regulatory filings related to Velez's termination.

42.     In sum, Velez and his new company are unfairly competing by using PCH's client lists, photocopies of TPM® materials, intellectual property, business contacts, goodwill, and former personnel who are in breach of employment agreements that were negotiated by Velez himself on behalf of PCH, with the intent to confuse the public, and to augment Velez's and VCM's competitive standing.

43.     To redress the injuries it has suffered, PCH seeks, *inter alia*, with respect to use of stolen intellectual and proprietary customer information, an accounting of all revenue derived from the use of PCH's confidential and proprietary information and the permanent enjoining of Velez from allowing the former employees from the continued breach of the covenants contained in their employment contracts.

44.     Upon a plenary hearing, PCH will also seek repayment of the $250,000.00 in converted funds; a direction to Velez to comply with the contractual remedies contained in the employment contracts of the former employees, the breach of which he induced; remedies of various common law violations; and additional compensatory and punitive damages.

9

## FIRST CAUSE OF ACTION
### (Conversion of funds)

45.    Respondent Velez converted at least $250,000.00 in corporate funds to his personal use, which remain due and owing to PCH.

## SECOND CAUSE OF ACTION
### (Conversion of intellectual property)

46.    Respondent Velez provided PCH intellectual property and confidential information to VCM customers and prospective customers without authorization from PCH, thereby depriving PCH of the revenues from the sale of DVD's, revenues from the sale of seminar admissions and other compensation.

## THIRD CAUSE OF ACTION
### (Inducement of Breach of Contract and Covenants Not to Compete, Not to Solicit and Not to Disclose Confidential Information)

47.    In their employment contracts the former employees agreed to covenants not to compete with PCH, not to solicit customers or employees, during their employment by PCH or for one year after their departure from PCH; and to never divulge PCH's confidential information.

48.    The former employees, by Velez's inducement, have breached the terms of their employment contracts by, within one year of their termination 1) joining VCM, a direct competitor firm; and 2) soliciting current and former PCH customers and employees.

49.    The former employees have also breached their covenant not to disclose confidential PCH information obtained during that employment, including but not limited to customer lists, pricing structures and stock trading processes, and information related to TPM®.

## FOURTH CAUSE OF ACTION
### (Refusal to Abide by NASD Supervisory and Regulatory Rules
with the Intent of Harming MTC)

50.     In an attempt to cause damage to MTC, Respondent refuses to cooperate with MTC in fulfilling its regulatory duties.

51.     In consequence of his prior position as a Registered Principal of MTC, and his present status as an Associated Person of MTC, Velez is subject to the federal securities statutes, SEC regulations, and FINRA Rules, the enforcement of which are the mandated responsibility of MTC.

52.     Presently, Velez is in noncompliance of certain FINRA Rules and refuses to cooperate in providing information required under the rules, which may result in damaging regulatory action against MTC in the form of substantial sanctions and fines.

## FIFTH CAUSE OF ACTION
### (Unfair Competition)

53.     For over a decade, PCH, and "The Pristine Method®" ("TPM®") have set the standard for the education of active securities traders around the world.  The resources and methods used are all subject to registered service marks, trademarks and copyrights.  Velez and VCM, through repeated reference in advertising and promotional materials, and by cloning TPM® for Velez's and VCM's use, are causing great confusion among the trading community and the public at large, to the detriment of Plaintiffs.

54.     Respondent has engaged in a variety of acts, including the conversion of confidential information owned  by PCH to the use of VCM, in bad faith, and with intent to injure, weaken or destroy PCH's rights to and interests in TPM® and other marks, and to

## SIXTH CAUSE OF ACTION
### (Faithless servant)

55.     Respondent Velez's conduct is that of a faithless servant under New York law and he must disgorge all salaries earned and profits received both prior to and after his termination from PCH. *Duane Jones Company, Inc. v. Burke*, 306 N.Y. 172 (1954)

## SEVENTH CAUSE OF ACTION
### (Breach of Duty of Loyalty)

56.     Respondent Velez owed a duty of loyalty and other fiduciary duties to PCH as its Chairman and CEO and because of his 47% ownership interest.

57.     By commencing, surreptitiously, the formation of VCM while still employed by PCH, and as a 47% owner of PCH, and by inducing the former employees to breach their PCH employment contracts and the non-compete, non-solicitation, and non- disclosure covenants, Velez breached his duty of loyalty to PCH.

58.     By performing work for VCM while employed by PCH, Velez breached his duty of loyalty to PCH.

59.     By providing confidential PCH information to VCM, which is in direct competition with PCH, Velez breached his duty of loyalty to PCH.

## EIGHTH CAUSE OF ACTION
### (Tortious Interference with Prospective Economic Advantage)

60.     In order to solicit and enter into relationships with current and former PCH customers, Velez has maliciously used confidential PCH information, including but not limited to customer lists and pricing structures.

current and former PCH customers, some of PCH's customers have terminated all or part of their relationships with PCH and/or entered into relationships with VCM.

62.    There is a reasonable probability that in the absence of the intentional and malicious use of confidential PCH information by respondent and VCM in the course of their solicitation of current and former PCH customers, those customers would not have terminated all or part of their relationships with PCH, and would have continued their relationships with PCH.

63.    Respondent and the former employees have used confidential information to solicit PCH customers with the intent to harm PCH.

**WHEREFORE**, plaintiff respectfully requests the following relief:

A.    The repayment of the $250,000 of corporate funds unlawfully converted to Velez's personal use.

B.    Additional compensatory damages in an amount not less than $750,000.00, plus attorney's fees, pursuant to the terms of the former employee contracts, and fees and costs related to this proceeding.

C.    On all of PCH's Causes of Action, punitive damages in an amount no less than $1,000,000.00.

D.    Permanent injunctive relief:

1.    Directing Velez to immediately Cease and Desist from inducing the breach of the employment agreements of the former employees, which contain restrictive covenants forbidding them from competing with Plaintiff for one year after their employment terminates with PCH; from soliciting Plaintiff's customers or employees for one year after their employment terminates with PCH; and from ever disclosing the confidential information of PCH;

13

2.    Directing Respondent to Cease and Desist from using materials obtained from PCH, including but not limited to materials taken from "The Pristine Method®" manual;

3.    Directing Respondent to immediately Cease and Desist from copying and using Plaintiffs' copyrighted and trademarked material, and registered service marks, including but not limited to The Pristine Method®;

4.    Directing Respondent to immediately Cease and Desist from copying materials copyrighted and trademarked by Plaintiffs and presenting them to the public as part of the "Trade for Life" methods and seminars presented by Velez Capital Management;

5.    Directing Respondent to immediately Cease and Desist from presenting to current and future customers "The Pristine Method®" and other registered and trademarked materials, disguised as "Trade for Life";

6.    Directing Velez and VCM to provide an accounting of all compensation and revenues received by Velez and VCM to date; and

7.    Directing Velez and VCM to disgorge all salaries and profits, paid to Velez and to the former employees; to return all PCH materials removed during the term of their employment; and to identify and erase and/or return as applicable, all electronic records taken from PCH during the term of their employment.

Dan A. Druz
Attorney for Claimants
291 E. Main St.
Suite 1000
Manasquan, NJ  08736
732-223-7676

Dated: August 17, 2007

14

# EXHIBIT 1

| | | |
|---|---:|---|
| 2005 Amex charges posted to Pre-paid Personal Expensess, Velez | $ 34,815.65 | See Amex spreadsheet |
| 2006 Amex charges posted to Pre-paid Personal Expenses, Velez | $ 149,488.70 | see Amex Spreadsheet |
| payments made to Pristine by Velez | $ (57,300.00) | |
| additional personal expenses posted in PCH | $ 791.50 | home owners insurance, CT property taxe |
| Irvine deposit | $ 22,622.00 | |
| | $ 150,217.85 | |
| Additional 2005 amex charges likely to be personal | $ 69,660.21 | See Amex spreadsheet, subject to review by Greg |
| Additional 2006 amex charges likely to be personal | $ 32,289.68 | See Amex spreadsheet, subject to review by Greg |
| | $ 252,167.74 | |

# EXHIBIT 2

January 1, 2005

Mr. Paul Lange

Dear Mr Lange:

The three most valuable and essential assets of this company, Pristine Capital Holdings, Inc. (the "Company"), are its employee relationships, its customer relationships and its confidential business information. These assets are created at great expense and are easily perishable and eroded. If these assets are seriously impaired, the future growth and even the existing level of the Company's operations and financial performance will be negatively impacted. We cannot as a practical matter purchase insurance to cover damage or loss of these assets. We can, however, work together to protect, preserve and grow these assets. The key is commitment by every employee.

By this letter, we are pleased to offer you the position of Director of Pristine Services. As a precondition to your employment, we request that you make a positive commitment to every other Company employee as well as to the Company to help ensure our success and to protect our assets by signing and returning this letter. The purpose of this letter is to state the terms of your employment with the Company and to obtain your commitment by defining your obligations concerning (1) the nature of your employment relationship with the Company, (2) your competition with the Company, and (3) confidential information belonging to the Company.

1.    **Terms of Employment.** The Company agrees to employ you to perform the duties set forth on *Exhibit A* to this letter and you agree to accept such employment with the Company on the terms and conditions contained in this letter. Your employment will commence immediately on the date of this letter and will continue unless terminated by either of us as provided herein. You may terminate your employment with the Company at any time for any reason by giving the Company advance written notice. The Company may terminate your employment at any time for any reason by providing you with two weeks notice of termination or payment of your base salary in lieu thereof. In addition, the Company may terminate your employment immediately upon notice to you in the event that you breach any of the terms of this letter.

2.    **Compensation.** For your services, the Company will pay you the compensation and incentive compensation set forth on *Exhibit A* to this letter. The Company will be required to withhold certain amounts from

retirement, medical or insurance plans of the Company to the extent offered by the Company and to the extent you are eligible under the terms of such plans.

3.    **Non-Competition Agreement.**  During the term of your employment by the Company and for a period of one year following the termination or expiration of your employment for any reason, you will not, without the prior written consent of the Company, either directly or indirectly, on your own behalf or on behalf of others, provide assistance or services that are materially similar or identical to the services provided by you to the Company to any Competing Business (as defined below) or own a majority ownership interest in or be a partner, director, principal or officer of a Competing Business that operates in North America or South America.

As used in this section and elsewhere in this letter, the term "Competing Business" means any business organization of whatever form directly engaged in any business or enterprise that is the same as, or substantially the same as, the business of the Company.  The Company is in the business of providing stock market advisory services (whether written, oral or in electronic form), educational and mentoring services related to the financial markets, including live and/or broadcast seminars, broker dealer services, direct access trading and related activities.

4.    **Agreement Not to Solicit Clients and Others.**  During the term of your employment by the Company and for a period of one year following the termination or expiration of your employment for any reason, you will not, without the prior written consent of the Company, either directly or indirectly, on your own behalf or on behalf of others, have any business dealings whatsoever with or solicit or attempt to solicit to any Competing Business, any customer or actively sought prospective customer of the Company or any Company affiliate with whom you have had regular contact, whose contacts with the Company have been supervised by you, or about whom you acquired Confidential Information (as defined below) in the course of your employment.  As used in this section and elsewhere in this letter, the term "Confidential Information" means all information to which you have access during your employment by the Company, including all data, formulae, compositions, processes, designs, graphs, past, current, and planned research and development, customer lists, current and anticipated customer requirements, price lists, pricing policies, supplier lists, market studies, business plans, operational methods, computer software and programs, systems, and structures, historical financial statements, financial projections and budgets, historical and projected sales, capital spending budgets and plans, plans for future development, the names and backgrounds of key personnel, personnel training and techniques and materials and all other information concerning the business and affairs of the Company or any Company affiliate and not readily available to the public.  The term "affiliate" of the Company means any person or entity controlled by, controlling or under common control with the Company including all Pristine companies or divisions.

5.    **Agreement Not to Solicit Employees.**  During the term of your employment by the Company and for a period of one year following the termination or expiration of your employment for any reason, you will not without the prior written consent of the Company, either directly or indirectly, on your own behalf or on behalf of others (:) solicit, employ, or otherwise _____ ___ __ _____ ____ independent contractor, or otherwise, any person who is or was an

Company or any Company affiliate to terminate his or her employment with the Company or such affiliate, or (2) interfere with the Company's business relationship with any person, including any person who at any time during the term of your employment was an employee, contractor, supplier or customer of the Company or any Company affiliate.

Paul Lange
January 1, 2005
Page 3

6.    **Confidential Information.** All Confidential Information (as defined in Section 4 above) received or developed by you while employed by the Company is confidential and will remain the sole and exclusive property of the Company. You acknowledge that the Confidential Information was developed and will be developed at great expense and constitutes trade secrets of the Company.    During the term of your employment you will follow all Company instructions with respect to Confidential Information and, except to the extent necessary to perform the duties assigned to you by the Company, you will hold all Confidential Information in trust and strictest confidence, and you will not use, reproduce, distribute or disclose any Confidential Information, or take any action causing, or fail to take the action necessary in order to prevent, any Confidential Information disclosed to or developed by you to lose its character or cease to qualify as Confidential Information. You agree that you will not use any Confidential Information for you own purposes or for the benefit of anyone other than the Company or permit any person to use, examine or make copies of any documents that contain or were derived from Confidential Information. The covenants of confidentiality set forth herein will continue after the date of termination of your employment relationship for so long as such Confidential Information retains its status as Confidential Information under applicable law.    Upon request by the Company, and in any event upon termination or expiration of your employment with the Company for any reason, you will promptly deliver to the Company all property belonging to the Company, including all Confidential Information, in your possession or control.

7.    **Other Agreements with Former Employers.** You agree to provide to the Company with a copy of the pertinent portions of any employment agreements or similar documents, if any, executed by you with former employers or any businesses with which you have been associated, which prohibit you during the time period of your employment with the Company from: (1) competing with, or in any way participating in a business; (2) soliciting personnel of the former employer or business; (3) disclosing confidential or proprietary information; or (4) soliciting customers of the former employer or business on behalf of another business.    You acknowledge that the Company has instructed you not to use or divulge to the Company, its agents, representatives or employees, at any time during your employment with the Company, any confidential information that you obtained from any previous employer or from any person to whom you owe a duty of confidentiality.    You understand that your disclosure of such information to the Company, its agents, representatives, or employees could cause irreparable harm to the Company, and you agree to be bound by the Company's instructions.

8.    **Compliance with Federal and State Laws.** You agree to conduct your activities on behalf of the Company in compliance with all applicable federal and state laws.    Should you suspect that other person in the Company may not be complying with this requirement or have questions regarding the propriety of certain conduct, you agree to specifically identify the concern with the president of the Company.

9.    **Compliance with Company Policies; Compliance with Equal Employment**

and unlawful harassment. Actions taken or conduct

sex, sexual orientation, race, national origin, age, religion, or any other legally protected characteristic are prohibited. You agree to comply with this policy and to enforce this policy by notifying the president of the Company if you suspect that other personnel in the Company may

Paul Lange
January 1, 2005
Page 4

not be complying with this requirement. If you have questions regarding the propriety of certain conduct, you also agree to specifically identify the concern with the president. Your failure to comply with the Company 's harassment policy will subject you to disciplinary action, including the possibility of termination of your employment.

10.    **Remedies.** You agree that the covenants contained in Sections 2 through 7 of this letter are of the essence of our agreement; that each of such covenants is reasonable and necessary to protect and preserve the interests and properties of the Company and its business; and that irreparable loss and damage will be suffered by the Company should you breach any of such covenants. Therefore, you agree and consent that, in addition to all the remedies provided at law or in equity, the Company will be entitled to obtain injunctive relief from a court to prevent any breach or contemplated breach of any of the covenants. The existence of any claim or action by you against the Company does not constitute a defense to the enforcement by the Company of any of the covenants or agreements in this letter. The Company will be entitled to recover reasonable attorneys' fees and costs from you in any action to enforce or defend its interests arising out of or relating to this letter.

11.    **Separate Provisions.** We both agree that each of the provisions included in this letter is separate, distinct, and severable from the other and remaining provisions of this letter, and that the invalidity or unenforceability of any provision will not affect the validity or enforceability of any other provision or provisions in this letter.

12.    **Governing Law.** This letter and the terms of your employment by the Company will be governed by the laws of the State of New York.

13.    **Entire Agreement.** This letter contains our entire agreement on your employment by the Company. No modification of this letter will be valid or binding upon the Company or you unless made in writing and signed by both you and the Company. All prior understandings and agreements relating to your employment by the Company are expressly superseded by the terms of this letter.

**THIS LETTER, AS A CONDITION OF YOUR EMPLOYMENT WITH THE COMPANY, IMPOSES CERTAIN RESTRICTIONS ON YOU WITH RESPECT TO (A) CONFIDENTIALITY OF INFORMATION BELONGING TO THE COMPANY, (B) COMPETITION WITH OR AGAINST THE COMPANY, (C) AND SOLICITATION OF THE COMPANY'S CUSTOMERS AND OTHER PARTIES WITH WHOM THE COMPANY HAS A BUSINESS RELATIONSHIP. PLEASE READ THIS LETTER CAREFULLY BEFORE SIGNING IT.**

Signatures on following page

Paul Lange
January 1, 2005
Page 5


Pristine Capital Holdings, Inc.

Oliver L. Velez, CEO


I have read and understand this letter and I hereby agree to the terms of this letter.

Paul Lange

Date: January 1, 2005

EXHIBIT A

**NAME:**      Paul Lange

**POSITION:**   Director of Pristine Services

**SALARY:**     $84,000 annually

**DUTIES:**     Responsibilities shall include but not be limited to the following.

- Manage the RealTime Trading Rooms, including scheduling and training and Lead Moderator of PMTR
- Lead the Pristine Research Department, including maintenance of procedures and guidelines, day to day monitoring of letters, and scheduling and training participants
- Senior Instructor at 12 paid Pristine seminars annually
- Senior instructor at 12 Free Pristine workshops annually
- Senior instructor at 2 Pristine Mentorships annually

Additional compensation:
- Events instructed in addition to those listed above will be paid out per Senior pay rates outlined in Pristine Certified Trainer guidelines
- Mentorships taught in addition to two required will be paid out at 40% of net profits
- Completed coaching to be paid out at 30% of earned revenue
- Creation of Pristine CD/DVD products at a 15% royalty

**PERKS:**      Annual year-end allocation of options on a pro-rata basis of payroll in relation to overall company performance versus goals.

Health insurance provided by company for employee

2

### 1060. Persons Exempt from Registration

(a) The following persons associated with a member are not required to be registered with the Association:

(1) persons associated with a member whose functions are solely and exclusively clerical or ministerial;

(2) persons associated with a member who are not actively engaged in the investment banking or securities business;

(3) persons associated with a member whose functions are related solely and exclusively to the member's need for nominal corporate officers or for capital participation; and

(4) persons associated with a member whose functions are related solely and exclusively to:

(A) effecting transactions on the floor of a national securities exchange and who are registered as floor members with such exchange;

(B) transactions in municipal securities;

(C) transactions in commodities; or

(D) transactions in security futures, provided that any such person is registered with a registered futures association.

(b) Member firms, and persons associated with a member, may pay to nonregistered foreign persons transaction-related compensation based upon the business of customers they direct to member firms if the following conditions are met:

(1) the member firm has assured itself that the nonregistered foreign person who will receive the compensation (the "finder") is not required to register in the U.S. as a broker/dealer nor is subject to a disqualification as defined in Article III, Section 4 of the Association's By-Laws, and has further assured itself that the compensation arrangement does not violate applicable foreign law;

(2) the finders are foreign nationals (not U.S. citizens) or foreign entities domiciled abroad;

(3) the customers are foreign nationals (not U.S. citizens) or foreign entities domiciled abroad transacting business in either foreign or U.S. securities;

(4) customers receive a descriptive document, similar to that required by Rule 206(4)-3(b) of the Investment Advisers Act of 1940, that discloses what compensation is being paid to finders;

(5) customers provide written acknowledgment to the member firm of the existence of the compensation arrangement and that such acknowledgment is retained and made available for inspection by the Association;

(6) records reflecting payments to finders are maintained on the member firm's books and actual agreements between the member firm and persons compensated are available for inspection by the Association; and

(7) the confirmation of each transaction indicates that a referral or finders fee is being paid pursuant to an agreement.

[Amended by SR-NASD-80-01 eff. June 26, 1980; amended by SR-NASD-88-12 eff. Nov. 2, 1988; amended by SR-NASD-94-51 eff. Feb. 15, 1995; amended by SR-NASD-95-39 eff. Aug. 20, 1996; amended by SR-NASD-98-86 eff. Nov. 19, 1998; amended by SR-NASD-2002-40 eff. Oct. 15, 2002.]

## BY-LAWS OF NASD REGULATION, INC.

### ARTICLE I

### DEFINITIONS

When used in these By-Laws, unless the context otherwise requires, the term:

(a) "Act" means the Securities Exchange Act of 1934, as amended;

(b) "Board" means the Board of Directors of NASD Regulation;

(c) "broker" shall have the same meaning as in Section 3(a)(4) of the Act;

(d) "Commission" means the Securities and Exchange Commission;

(e) "day" means calendar day;

(f) "dealer" shall have the same meaning as in Section 3(a)(5) of the Act;

(g) "Delaware law" means the General Corporation Law of the State of Delaware;

(h) "Delegation Plan" means the "Plan of Allocation and Delegation of Functions by NASD to Subsidiaries" as approved by the Commission, and as amended from time to time;

(i) "Director" means a member of the Board;

(j) "district" means a district established by the Board pursuant to Article VIII, Section 8.1 of these By-Laws;

(k) "District Committee" means a District Committee elected pursuant to Article VIII of these By-Laws;

(l) "District Director" means an NASD Regulation staff member who heads a district office;

(m) "District Nominating Committee" means a District Nominating Committee elected pursuant to Article VIII of these By-Laws;

(n) "district office" means an office of NASD Regulation located in a district;

(o) "Executive Representative" means the executive representative of an NASD member appointed pursuant to Article IV, Section 3 of the NASD By-Laws;

(p) "Independent Agent" means a corporation or entity selected by the Secretary of NASD Regulation to assist NASD Regulation with nomination and election procedures under Articles VI and VIII of these By-Laws and the representatives of such corporation or entity;

(q) "Industry Director" or "Industry member" means a Director (excluding the President of NASD Regulation and the Chief Executive Officer of NASD) or a National Adjudicatory Council or committee member who (1) is or has served in the prior three years as an officer, director, or employee, of a broker or dealer, excluding an outside director or a director not engaged in the day-to-day management of a broker or dealer; (2) is an officer, director (excluding an outside director), or employee of an entity that owns more than ten percent of the equity of a broker or dealer, and the broker or dealer accounts for more than five percent of the gross revenues received by the consolidated entity; (3) owns more than five percent of the equity securities of any broker or dealer, whose investments in brokers or dealers exceed ten percent of his or her net worth, or whose ownership interest otherwise permits him or her to be engaged in the day-to-day management of a broker or dealer; (4) provides professional services to brokers or dealers, and such services constitute 20 percent or more of the professional revenues received by the Director or member or 20 percent or more of the gross revenues received by the Director's or member's firm or partnership; (5) provides professional services to a director, officer, or employee of a broker, dealer, or corporation that owns 50

percent or more of the voting stock of a broker or dealer, and such services relate to the director's, officer's, or employee's professional capacity and constitute 20 percent or more of the professional revenues received by the Director or member or 20 percent or more of the gross revenues received by the Director or member firm or partnership; or (6) has a consulting or employment relationship with or provides professional services to the NASD, NASD Regulation, Nasdaq, NASD Dispute Resolution, or Amex (and any Predecessor), or has had any such relationship or provided any such services at any time within the prior three years;

(r) "NASD" means the National Association of Securities Dealers, Inc.;

(s) "NASD Board" means the NASD Board of Governors;

(t) "NASD Dispute Resolution" means NASD Dispute Resolution, Inc.;

(u) "NASD member" means any broker or dealer admitted to membership in the NASD;

(v) "NASD Regulation" means NASD Regulation, Inc.;

(w) "National Adjudicatory Council" means a body appointed pursuant to Article V of these By-Laws.

(x) "National Nominating Committee" means the National Nominating Committee appointed pursuant to Article VII, Section 9 of the NASD By-Laws;

(y) "Non-Industry Director" or "Non-Industry member" means a Director (excluding the President of NASD Regulation and the Chief Executive Officer of NASD) or a National Adjudicatory Council or committee member who is (1) a Public Director or Public member; (2) an officer or employee of an issuer of securities listed on Nasdaq or Amex, traded in the over-the-counter market; or (3) any other individual who would not be an Industry Director or Industry member;

(z) "person associated with a member" or "associated person of a member" means: (1) a natural person who is registered or has applied for registration under the Rules of the Association; (2) a sole proprietor, partner, officer, director, or branch manager of a member, or other natural person occupying a similar status or performing similar functions, or a natural person engaged in the investment banking or securities business who is directly or indirectly controlling or controlled by a member, whether or not any such person is registered or exempt from registration with the NASD under these By-Laws or the Rules of the Association; and (3) for purposes of Rule 8210, any other person listed in Schedule A of Form BD of a member.

(aa) "Public Director" or "Public member" means a Director or National Adjudicatory Council or committee member who has no material business relationship with a broker or dealer or the NASD, NASD Regulation, or Nasdaq;

(bb) "Regional Nominating Committee" means a Regional Nominating Committee that nominates to the National Nominating Committee a candidate for the National Adjudicatory Council to represent a geographical region as provided in Article VI of these By-Laws; and

(cc) "Rules of the Association" or "Rules" means the numbered rules set forth in the NASD Manual beginning with the Rule 0100 Series, as adopted by the NASD Board pursuant to the NASD By-Laws, as hereafter amended or supplemented.

(dd) "Floor Governor" or "Amex Floor Governor" means a Floor Governor of Amex elected pursuant to Article I, Section 01(a) of the Amex By-Laws;

(ee) "Nasdaq-Amex" means Nasdaq-Amex Market Group, Inc.;

(ff) "Amex" means American Stock Exchange LLC;

(gg) "Amex Board" means the Board of Governors of Amex;

**Art. 1**

©2001, National Association of Securities Dealers, Inc.

in paragraph (b), the NASD Board shall review the membership proceeding not later than the next meeting of the NASD Board. The NASD Board may order the Applicant and the Department to file briefs in connection with review proceedings pursuant to this paragraph.

**(d) Decision of NASD Board, Including Remand**

After review, the NASD Board may affirm, modify, or reverse the proposed written decision of the National Adjudicatory Council. Alternatively, the NASD Board may remand the membership proceeding with instructions. The NASD Board shall prepare a written decision that includes all of the elements described in Rule 1015(j)(2).

**(e) Issuance of Decision**

The NASD Board shall serve its written decision on the Applicant within 15 days after the meeting at which it conducted its review. The decision shall constitute the final action of the Association for purposes of SEC Rule 19d-3, unless the NASD Board remands the membership proceeding.

[Adopted by SR-NASD-97-28 eff. Aug. 7, 1997; amended by SR-NASD-97-81 eff. Jan. 16, 1998; amended by SR-NASD-99-67 eff. Nov. 15, 2000.]

## 1017. Application for Approval of Change in Ownership, Control, or Business Operations

**(a) Events Requiring Application**

A member shall file an application for approval of any of the following changes to its ownership, control, or business operations:

(1) a merger of the member with another member, unless both are members of the New York Stock Exchange, Inc. or the surviving entity will continue to be a member of the New York Stock Exchange, Inc.;

(2) a direct or indirect acquisition by the member of another member, unless the acquiring member is a member of the New York Stock Exchange, Inc.;

(3) a direct or indirect acquisition of substantially all of the member's assets, unless the acquirer is a member of the New York Stock Exchange, Inc.;

(4) a change in the equity ownership or partnership capital of the member that results in one person or entity directly or indirectly owning or controlling 25 percent or more of the equity or partnership capital; or

(5) a material change in business operations as defined in Rule 1011(i).

**(b) Filing and Content of Application**

(1) The member shall file the application with the Department at the district office in the district in which the member's principal place of business is located. If the application involves a merger between members with principal places of business in two or more districts, the application shall be filed and processed by the district office wherein the surviving firm's principal place of business will be located.

(2) The application shall describe in detail the change in ownership, control, or business operations and include a business plan, pro forma financials, an organizational chart, and written supervisory procedures reflecting the change.

(A) If the application requests approval of a change in ownership or control, the application also shall include the names of the new owners, their percentage of ownership, and the sources of their funding for the purchase and recapitalization of the member.

# Form BD

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0012 |
| Expires: | September 30, 2007 |
| Estimated average burden | |
| hours per response........ | 2.75 |
| per amendment ........ | 0.33 |

# Uniform Application for
# Broker-Dealer Registration

Persons who respond to the collection of information contained
in this form are not required to respond unless the form displays
a currently valid OMB control number.

# FORM BD INSTRUCTIONS

## A. GENERAL INSTRUCTIONS

1. Form BD is the Uniform Application for Broker-Dealer Registration. Broker-Dealers must file this form to register with the Securities and Exchange Commission, the *self-regulatory organizations*, and *jurisdictions* through the Central Registration Depository ("CRD") system, operated by the NASD.

2. **UPDATING** – By law, the *applicant* must promptly update Form BD information by submitting amendments whenever the information on file becomes inaccurate or incomplete for any reason.

3. **CONTACT EMPLOYEE** – The individual listed as the contact employee must be authorized to receive all compliance information, communications, and mailings, and be responsible for disseminating it within the *applicant's* organization.

4. **GOVERNMENT SECURITIES ACTIVITIES**

   A. Broker-dealers registered or *applicants* applying for registration under Section 15(b) of the Exchange Act that conduct (or intend to conduct) a government securities business in addition to other broker-dealer activities (if any) must file a notice on Form BD by answering "yes" to Item 2B.

   B. Section 15C of the Securities Exchange Act of 1934 requires sole government securities broker-dealers to register with the SEC. To do so, answer "yes" to Item 2C if conducting *only* a government securities business.

   C. Broker-dealers registered under Section 15(b) of the Exchange Act that cease to conduct a government securities business must file notice when ceasing their activities in government securities. To do so, file an amendment to Form BD and answer "yes" to Item 2D.

   NOTE: Broker-dealers registered under Section 15C may register under Section 15(b) by filing an amendment to Form BD and answering "yes" to Items 2A and 2D. By doing so, broker-dealer expressly consents to withdrawal of broker-dealer's registration under 15C of the Exchange Act.

5. **FEDERAL INFORMATION LAW AND REQUIREMENTS** – An agency may not conduct or sponsor, and a *person* is not required to respond to, a collection of information unless it displays a currently valid control number. Section 15, 15c, 17(a) and 23(a) of the Exchange Act authorize the Commission to collect the information on this Form from registrants. See 15 U.S.C. §§78o, 78o-5, 78-q and 78w. Filing of this Form is mandatory; however the social security number information, which aids in identifying the *applicant*, is voluntary. The principal purpose of this Form is to permit the Commission to determine whether the *applicant* meets the statutory requirement to engage in the securities business. The Form also is used by *applicants* to register as broker-dealers with certain *self-regulatory organizations* and all of the states. The Commission and the National Association of Securities Dealers, Inc. maintain the files of the information on this Form and will make the information publicly available. Any member of the public may direct to the Commission any comments concerning the accuracy of the burden estimate on application facing page of this Form, and any suggestions for reducing this burden. This collection of information has been reviewed by the Office of Management and Budget in accordance with the clearance requirements of 44 U.S.C. §3507. The information contained in this form is part of a system of records subject to the Privacy Act of 1974, as amended. The Securities and Exchange Commission has published in the Federal Register the Privacy Act Systems of Records Notice for these records.

## B. PAPER FILING INSTRUCTIONS (FIRST TIME *APPLICANTS* FILING WITH CRD AND WITH SOME *JURISDICTIONS*)

1. **FORMAT**

   A. A full paper Form BD is required when the *applicant* is filing with the CRD for the first time. In addition, some *jurisdictions* may require a separate paper filing of Form BD. The *applicant* should contact the appropriate *jurisdiction(s)* for specific filing requirements.

   B. Attach an Execution Page (Page 1) with original manual signatures to the initial Form BD filing.

   C. Type all information.

   D. Give the name of the broker-dealer and date on each page.

   E. Use only the current version of Form BD and its Schedules or a reproduction of them.

2. **DISCLOSURE REPORTING PAGE (DRP)** – Information concerning the *applicant or control affiliate* that relates to the occurrence of an event reportable under Item 11 must be provided on the *applicant's* appropriate DRP(BD). If a *control affiliate* is an individual or organization registered through the CRD, such *control affiliate* need only complete Part I of the *applicant's* appropriate DRP(BD). Details of the event must be submitted on the *control affiliate's* appropriate DRP(BD) or DRP(U-4). Attach a copy of the fully completed DRP(BD), or DRP(U-4) previously submitted. If a *control affiliate* is an individual or organization not registered through the CRD, provide complete answers to all of the items on the *applicant's* appropriate DRP(BD).

3. **SCHEDULES A, B AND C** – File Schedules A and B only with initial applications for registration. Use Schedule C to update Schedules A and B. Individuals not required to file a Form U-4 (individual registration) with the CRD system who are listed on Schedules A, B, or C must attach page 2 of Form U-4. The *applicant* broker-dealer must be listed in Form U-4 Item 20 or 21. Signatures are not required.

4. **SCHEDULE D** – Schedule D provides additional space for explaining answers to Item 1C(2), and "yes" answers to items 5, 7, 8, 9, 10, 12, and 13 of Form BD.

## ELECTRONIC FILING INSTRUCTIONS (APPLICANTS/ REGISTERED BROKER-DEALERS FILING AMENDMENTS WITH CRD)

1. **FORMAT**

   A. Items 1-13 must be answered and all fields requiring a response must be completed before the filing will be accepted.

B. *Applicant* must complete the execution screen certifying that Form BD and amendments thereto have been executed properly and that the information contained therein is accurate and complete.

C. To amend information, *applicant* must update the appropriate Form BD screens.

D. A paper copy, with original manual signatures, of the initial Form BD filing and amendments to Disclosure Reporting Pages (DRPs BD) must be retained by the *applicant* and be made available for inspection upon a regulatory request.

2. **DISCLOSURE REPORTING PAGE (DRP)** – Information concerning the *applicant* or *control affiliate* that relates to the occurrence of an event reportable under Item 11 must be provided on the *applicant's* appropriate DRP(BD). If a *control affiliate* is an individual or organization registered through the CRD, such *control affiliate* need only complete the *control affiliate* name and CRD number of the *applicant's* appropriate DRP(BD). Details for the event must be submitted on the *control affiliate's* appropriate DRP(BD) or DRP(U-4). If a *control affiliate* is an individual or organization not registered through the CRD, provide complete answers to all of the questions and complete all fields requiring a response on the *applicant's* appropriate DRP(BD) screen.

3. **DIRECT AND INDIRECT OWNERS** – Amend the Direct Owners and Executive Officers screen and the Indirect Owners screen when changes in ownership occur. *Control affiliates* that are individuals who are not required to file a Form U-4 (individual registration) with the CRD must complete page 2 of Form U-4 (i.e., submit/file the information elicited by the Personal Data, Residential History, and Employment and Personal History sections of that Form). The *applicant* broker-dealer must be listed in Form U-4 Item 20 or 21.

The CRD mailing address for questions and correspondence is:

NASAA/NASD CENTRAL REGISTRATION DEPOSITORY
P.O. BOX 9495
GAITHERSBURG, MD 20898-9495

# EXPLANATION OF TERMS
### (The following terms are italicized throughout this form.)

1. **GENERAL**

**APPLICANT** – The broker-dealer applying on or amending this form.

**CONTROL** – The power, directly or indirectly, to direct the management or policies of a company, whether through ownership of securities, by contract, or otherwise. Any *person* that (i) is a director, general partner or officer exercising executive responsibility (or having similar status or functions); (ii) directly or indirectly has the right to vote 25% or more of a class of a voting security or has the power to sell or direct the sale of 25% or more of a class of voting securities; or (iii) in the case of a partnership, has the right to receive upon dissolution, or has contributed, 25% or more of the capital, is presumed to control that company. (This definition is used solely for the purpose of Form BD.)

**JURISDICTION** – A state, the District of Columbia, the Commonwealth of Puerto Rico, the U.S. Virgin Islands, or any subdivision or regulatory body thereof.

**PERSON** – An individual, partnership, corporation, trust, or other organization.

**SELF-REGULATORY ORGANIZATION** – Any national securities or commodities exchange or registered securities association, or registered clearing agency.

2. **FOR THE PURPOSE OF ITEM 5 AND SCHEDULE D**

**SUCCESSOR** - An unregistered entity that assumes or acquires substantially all of the assets and liabilities, and that continues the business of, a registered predecessor broker-dealer, who ceases its broker-dealer activities. [See Securities Exchange Act Release No. 31661   (December 28, 1992), 58 FR 7 (January 4, 1993)]

3. **FOR THE PURPOSE OF ITEM 11 AND THE CORRESPONDING DISCLOSURE REPORTING PAGES (DRPs)**

**CONTROL AFFILIATE** – A *person* named in Items 1A, 9 or in Schedules A, B or C as a *control* person or any other individual or organization that directly or indirectly controls, is under common control with, or is controlled by, the *applicant*, including any current employee except one performing only clerical, administrative, support or similar functions, or who, regardless of title, performs no executive duties or has no senior policy making authority.

**INVESTMENT OR INVESTMENT-RELATED** – Pertaining to securities, commodities, banking, insurance, or real estate (including, but not limited to, acting as or being associated with a broker-dealer, municipal securities dealer, government securities broker or dealer, issuer, investment company, investment adviser, futures sponsor, bank, or savings association).

**INVOLVED** – Doing an act or aiding, abetting, counseling, commanding, inducing, conspiring with or failing reasonably to supervise another in doing an act.

**FOREIGN FINANCIAL REGULATORY AUTHORITY** – Includes (1) a foreign securities authority; (2) other governmental body or foreign equivalent of a *self-regulatory organization* empowered by a foreign government to administer or enforce its laws relating to the regulation of *investment* or *investment-related* activities; and (3) a foreign membership organization, a function of which is to

2

regulate the participation of its members in the activities listed above.

**PROCEEDING** – Includes a formal administrative or civil action initiated by a governmental agency, *self-regulatory organization* or a *foreign financial regulatory authority*; a *felony* criminal indictment or information (or equivalent formal charge); or a *misdemeanor* criminal information (or equivalent formal charge). Does not include other civil litigation, investigations, or arrests or similar charges effected in the absence of a formal criminal indictment or information (or equivalent formal charge).

**CHARGED** – Being accused of a crime in a formal complaint, information, or indictment (or equivalent formal charge).

**ORDER** – A written directive issued pursuant to statutory authority and procedures, including orders of denial, suspension, or revocation; does not include special stipulations, undertakings or agreements relating to payments, limitations on activity or other restrictions unless they are included in an *order*.

**FELONY** – For *jurisdictions* that do not differentiate between a *felony* and a *misdemeanor*, a *felony* is an offense punishable by a sentence of at least one year imprisonment and/or a fine of at least $1,000. The term also includes a general court martial.

**MISDEMEANOR** – For *jurisdictions* that do not differentiate between a *felony* and a *misdemeanor*, a *misdemeanor* is an offense punishable by a sentence of less than one year imprisonment and/or a fine of less than $1,000. The term also includes a special court martial.

**FOUND** – Includes adverse final actions, including consent decrees in which the respondent has neither admitted nor denied the findings, but does not include agreements, deficiency letters, examination reports, memoranda of understanding, letters of caution, admonishments, and similar informal resolutions of matters.

**MINOR RULE VIOLATION** – A violation of a *self-regulatory organization* rule that has been designated as "minor" pursuant to a plan approved by the U.S. Securities and Exchange Commission. A rule violation may be designated as "minor" under a plan if the sanction imposed consists of a fine of $2,500 or less, and if the sanctioned person does not contest the fine. (Check with the appropriate *self-regulatory organization* to determine if a particular rule violation has been designated as "minor" for these purposes).

**ENJOINED** – Includes being subject to a mandatory injunction, prohibitory injunction, preliminary injunction, or a temporary restraining order.

2

3

**DAN A. DRUZ (DD-6177)**
291 E. Main St.
Suite 1000
Manasquan, NJ  08736
732 223-7676
Attorney for Plaintiffs

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



PRISTINE CAPITAL HOLDINGS INC.,

Plaintiff,

v.

VELEZ CAPITAL MANAGEMENT, LLC,
OLIVER VELEZ, PAUL LANGE, SAUL
ORTIZ-STEVENS, AND STEPHEN CINA,

Defendants.

Civil Action

ORDER TO SHOW CAUSE
WITH TEMPORARY RESTRAINTS
AND COMPELLING EXPEDITED
DISCOVERY

THIS MATTER, having been opened to the court by Dan A. Druz, Esq.,

Attorney for Plaintiff, PRISTINE CAPITAL HOLDINGS INC., for an Order to Show

Cause why a preliminary injunction should not be issued and the court, having considered

the Complaint, the Declaration of Counsel and of Ron Wagner, with exhibits attached,

the Memorandum of Law and this proposed Order to Show Cause with Temporary

IT IS, on the _____ day of June , 2007,

**DAN A. DRUZ (DD-6177)**
291 E. Main St.
Suite 1000
Manasquan, NJ 08736
732 223-7676
Attorney for Plaintiffs

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

*Judge Pauley*

_____

PRISTINE CAPITAL HOLDINGS INC.,

**07 CIV 5720**

Plaintiff,

Civil Action

v.

ORDER TO SHOW CAUSE
WITH TEMPORARY RESTRAINTS
AND COMPELLING EXPEDITED
DISCOVERY

VELEZ CAPITAL MANAGEMENT, LLC,
OLIVER VELEZ, PAUL LANGE, SAUL
ORTIZ-STEVENS, AND STEPHEN CINA,

Defendants.

_____

THIS MATTER, having been opened to the court by Dan A. Druz, Esq.,

Attorney for Plaintiff, PRISTINE CAPITAL HOLDINGS INC., for an Order to Show

Cause why a preliminary injunction should not be issued and the court, having considered

the Complaint, the Declaration of Counsel and of Ron Wagner, with exhibits attached,

the Memorandum of Law and this proposed Order to Show Cause with Temporary

IT IS, on the _____ day of June , 2007,

**DAN A. DRUZ (DD-6177)**
291 E. Main St.
Suite 1000
Manasquan, NJ 08736
732 223-7676
Attorney for Plaintiff
Pristine Capital Holdings, Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

PRISTINE CAPITAL HOLDINGS INC.,

          Plaintiff,

·v.                                  Civil Action

VELEZ CAPITAL MANAGEMENT, LLC,    **COMPLAINT**
OLIVER VELEZ, PAUL LANGE, SAUL       **AND JURY DEMAND**
ORTIZ-STEVENS, AND STEPHEN CINA,

          Defendants.

_____

Plaintiff, Pristine Capital Holdings through its undersigned attorney, by way of

Complaint against Defendants Velez Capital Management, Oliver Velez, Paul Lange, Saul

Ortiz-Stevens, and Stephen Cina, states as follows:

### Parties

1.    Plaintiff Pristine Capital Holdings Inc. ("PCH") is a Delaware corporation with

its principal place of business located at 7 – 11 Broadway, Suite 210, White Plains, New York

belief, a limited liability corporation organized and existing under the laws of the State of

**DAN A. DRUZ (DD-6177)**
291 E. Main St.
Suite 1000
Manasquan, NJ  08736
732 223-7676
Attorney for Plaintiff
Pristine Capital Holdings, Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

PRISTINE CAPITAL HOLDINGS INC.,

                Plaintiff,

  v.                                Civil Action

VELEZ CAPITAL MANAGEMENT, LLC,    **COMPLAINT**
OLIVER VELEZ, PAUL LANGE, SAUL      **AND JURY DEMAND**
ORTIZ-STEVENS, AND STEPHEN CINA,

                Defendants.
_____

      Plaintiff, Pristine Capital Holdings through its undersigned attorney, by way of

Complaint against Defendants Velez Capital Management, Oliver Velez, Paul Lange, Saul

Ortiz-Stevens, and Stephen Cina, states as follows:

### Parties

    1.     Plaintiff Pristine Capital Holdings Inc. ("PCH") is a Delaware corporation with

its principal place of business located at 7 – 11 Broadway, Suite 210, White Plains, New York

belief, a limited liability corporation organized and existing under the laws of the State of

New York, having its principal place of business at 130 W. 42nd. St., 21st Fl., New York, NY 10036.

3.    Defendant Oliver Velez ("Velez") is the former Chairman and CEO of PCH, and is presently the CEO of VCM.

4.    Defendants Paul Lange ("Lange"), Saul Ortiz-Stevens ("Ortiz") and Stephen Cina ("Cina") (collectively, "the employee defendants") – are former key employees of PCH and are presently employed as executives of VCM.

## Nature of the Dispute

7.    Plaintiff, through a subsidiary, provides educational support and information services to active traders via the internet, seminars, publications, and DVDs and is considered to be a leader in the securities education industry.

8.    Combined, these services are known to clients and to the public by the registered service marks and trademarked sales, marketing and educational process – "The Pristine Method®" ("TPM®").

9.    Defendant Velez is the former Chairman and CEO of PCH.  For more than ten years, he had been the "face" of the company.  However, he was relieved of his duties on November 20, 2006, and was subsequently terminated on February 21, 2007 by PCH for breaches of fiduciary duty to PCH, and a number of major violations of company policy, including, but not limited to, converting more than $250,000.00 of corporate funds to his personal use; for removing, disclosing and using PCH intellectual property without permission; and for surreptitiously commencing the formation of a new company – Defendant

New York, having its principal place of business at 130 W. 42nd. St., 21st Fl., New York, NY 10036.

3.      Defendant Oliver Velez ("Velez") is the former Chairman and CEO of PCH, and is presently the CEO of VCM.

4.      Defendants Paul Lange ("Lange"), Saul Ortiz-Stevens ("Ortiz") and Stephen Cina ("Cina") (collectively, "the employee defendants") – are former key employees of PCH and are presently employed as executives of VCM.

### Nature of the Dispute

7.      Plaintiff, through a subsidiary, provides educational support and information services to active traders via the internet, seminars, publications, and DVDs and is considered to be a leader in the securities education industry.

8.      Combined, these services are known to clients and to the public by the registered service marks and trademarked sales, marketing and educational process – "The Pristine Method®" ("TPM®").

9.      Defendant Velez is the former Chairman and CEO of PCH. For more than ten years, he had been the "face" of the company. However, he was relieved of his duties on November 20, 2006, and was subsequently terminated on February 21, 2007 by PCH for breaches of fiduciary duty to PCH, and a number of major violations of company policy, including, but not limited to, converting more than $250,000.00 of corporate funds to his personal use; for removing, disclosing and using PCH intellectual property without permission; and for surreptitiously commencing the formation of a new company – Defendant

2

10.    Once relieved of his duties in November of 2006, Defendant Velez, who was one of the co-founders of the company a decade earlier, conceived and commenced a plan of retaliation against his former company.   The gist of his plan was the secret formation of VCM, a company whose purpose was to compete directly with PCH.  In fact, while still employed by PCH, Velez registered two websites, one on December 20, 2006 and another on February 14, 2007.

11.    With the benefit of hindsight, it is now clear that soon after he was relieved of his duties as head of the company in November, 2006, Velez surreptitiously began collecting and copying confidential information, such as customer lists, seminars on DVD, and other material.  The content of the DVDs and other media, is packaged and sold to PCH's customer base, and a primary source of revenue for the company.

12.    By February, if not earlier, and while still in the employ of PCH, Velez was also developing relationships with other companies, which he claimed was for the benefit of PCH.  He ignored the requests of PCH executives, however, that he not develop associations with certain individuals whose reputation was inconsistent with PCH's corporate image, policies and objectives.

13.    Contrary to these instructions, Velez proceeded to promote a joint seminar with a company of poor reputation in the securities education industry.  When confronted by PCH management at that time, Velez intentionally deceived them by falsely claiming that the advertised event was for the exclusive benefit of PCH, when in fact the purpose of the seminar was the launching of Defendant VCM, Velez's new venture.

and his duty of loyalty to PCH, of which he presently continues to be a 47% owner.

3

10.    Once relieved of his duties in November of 2006, Defendant Velez, who was one of the co-founders of the company a decade earlier, conceived and commenced a plan of retaliation against his former company. The gist of his plan was the secret formation of VCM, a company whose purpose was to compete directly with PCH. In fact, while still employed by PCH, Velez registered two websites, one on December 20, 2006 and another on February 14, 2007.

11.    With the benefit of hindsight, it is now clear that soon after he was relieved of his duties as head of the company in November, 2006, Velez surreptitiously began collecting and copying confidential information, such as customer lists, seminars on DVD, and other material. The content of the DVDs and other media, is packaged and sold to PCH's customer base, and a primary source of revenue for the company.

12.    By February, if not earlier, and while still in the employ of PCH, Velez was also developing relationships with other companies, which he claimed was for the benefit of PCH. He ignored the requests of PCH executives, however, that he not develop associations with certain individuals whose reputation was inconsistent with PCH's corporate image, policies and objectives.

13.    Contrary to these instructions, Velez proceeded to promote a joint seminar with a company of poor reputation in the securities education industry. When confronted by PCH management at that time, Velez intentionally deceived them by falsely claiming that the advertised event was for the exclusive benefit of PCH, when in fact the purpose of the seminar was the launching of Defendant VCM, Velez's new venture,

and his duty of loyalty to PCH, of which he presently continues to be a 47% owner.

3

15.    As demonstrated in emails sent by a company Vice-President to Velez on February 12, 2007, in which the executive complained to Velez that his inexplicable, public association with another securities industry entity of dubious reputation, his actions were causing confusion and discomfort among PCH staff and its customers:

> "[Customers and employees] see HLV commercials on CNBC for you doing a seminar with [a potential competitor] and wonder what the hell is going on. You tell us that it's nothing to worry about because you are "just" doing a book signing and will only be there for the last 5 minutes. Well I find it hard to believe that HLV is going through all this marketing just for 5 minutes of your time to sign books. There is no mention of any book signing.... It's marketed as a seminar that you are doing and they removed all links to Pristine. On top of all that, [our employees] are all in the dark about this. No one was informed about this. We have to find out about it via our clients. But not only that, you proceeded to set this up in a clandestine manner.

In fact, despite Velez's denials, his presence at the seminar was heavily promoted and advertised by the potential competitor on February 8 and February 9, 2007 on their website's home page, while Velez was still employed by PCH.

16.    The seminar took place on February 18, 2007 as advertised. When PCH employees attempted to attend in order to observe Velez's role at the presentation, they were physically blocked from entering the room. Their exclusion was for reasons that later became obvious. Velez was using the venue to launch his new company, VCM.

17.    Velez was immediately terminated, by letter dated February 21, 2007. The seminar event, in concert with the previous discovery of the conversion of a quarter million dollars in corporate funds to his personal use, including lavish dinners, and large cash

precipitating, but not the only factors that resulted in Velez's termination.

15.    As demonstrated in emails sent by a company Vice-President to Velez on February 12, 2007, in which the executive complained to Velez that his inexplicable, public association with another securities industry entity of dubious reputation, his actions were causing confusion and discomfort among PCH staff and its customers:

> "[Customers and employees] see HLV commercials on CNBC for you doing a seminar with [a potential competitor] and wonder what the hell is going on.  You tell us that it's nothing to worry about because you are "just" doing a book signing and will only be there for the last 5 minutes.  Well I find it hard to believe that HLV is going through all this marketing just for 5 minutes of your time to sign books.  There is no mention of any book signing.... It's marketed as a seminar that you are doing and they removed all links to Pristine.   On top of all that, [our employees] are all in the dark about this.  No one was informed about this. We have to find out about it via our clients.  But not only that, you proceeded to set this up in a clandestine manner.

In fact, despite Velez's denials, his presence at the seminar was heavily promoted and advertised by the potential competitor on February 8 and February 9, 2007 on their website's home page, while Velez was still employed by PCH.

16.    The seminar took place on February 18, 2007 as advertised.  When PCH employees attempted to attend in order to observe Velez's role at the presentation, they were physically blocked from entering the room.  Their exclusion was for reasons that later became obvious.  Velez was using the venue to launch his new company, VCM.

17.    Velez was immediately terminated, by letter dated  February 21, 2007.  The seminar event, in concert with the previous discovery of the conversion of a quarter million dollars in corporate funds to his personal use, including lavish dinners, and large cash

precipitating, but not the only factors that resulted in Velez's termination.

18.    In response to his termination, Velez clearly indicated his mistaken belief that the proprietary information and materials underlying "The Pristine Method®" belonged to him, and that he would use them as he saw fit.

19.    Contemporaneous with his termination from PCH, Velez was illicitly inducing certain key employees of PCH – the defendant employees here, Lange, Ortiz and Cina – to breach their employment contracts with PCH.

20.    On information and belief, on or about 2/14/07 VCM hired Defendant Ortiz even before Velez's termination with PCH. On or about 3/30/07 VCM hired Defendant Lange. On or about 4/25/07, VCM hired Defendant Cina. Reviewing now, Ortiz's and Cina's actions at that time, it is clear that they were conspiring with Velez to leave the firm prior to Velez's termination.

21.    The employee defendants' employment contracts state in pertinent part at Paragraph "10" thereof:

> "...Therefore, you agree and consent that, in addition to all of the remedies provided at law or in equity, the Company will be entitled to obtain injunctive relief from a court to prevent any breach or contemplated breach of any of the covenants. The existence of any claim or action by you against the Company does not constitute a defense to the enforcement by the Company of any of the covenants or agreements in this letter. The Company will be entitled to recover reasonable attorneys' fees and costs from you in any action to enforce or defend its interests arising out of or relating to this [contract]."

22.    Velez induced the employee defendants to breach their (identical) employment

18.    In response to his termination, Velez clearly indicated his mistaken belief that the proprietary information and materials underlying "The Pristine Method®" belonged to him, and that he would use them as he saw fit.

19.    Contemporaneous with his termination from PCH, Velez was illicitly inducing certain key employees of PCH – the defendant employees here, Lange, Ortiz and Cina – to breach their employment contracts with PCH.

20.    On information and belief, on or about 2/14/07 VCM hired Defendant Ortiz even before Velez's termination with PCH. On or about 3/30/07 VCM hired Defendant Lange. On or about 4/25/07, VCM hired Defendant Cina. Reviewing now, Ortiz's and Cina's actions at that time, it is clear that they were conspiring with Velez to leave the firm prior to Velez's termination.

21.    The employee defendants' employment contracts state in pertinent part at Paragraph "10" thereof:

> "...Therefore, you agree and consent that, in addition to all of the remedies provided at law or in equity, the Company will be entitled to obtain injunctive relief from a court to prevent any breach or contemplated breach of any of the covenants. The existence of any claim or action by you against the Company does not constitute a defense to the enforcement by the Company of any of the covenants or agreements in this letter. The Company will be entitled to recover reasonable attorneys' fees and costs from you in any action to enforce or defend its interests arising out of or relating to this [contract]."

22.    Velez induced the employee defendants to breach their (identical) employment

contracts, as he had executed them on behalf of PCH when the agreements were originally signed by the employee defendants' during the prior five years.

23.    In the course of his employment, Velez and the employee defendants had unfettered access to PCH's customer lists and other confidential and proprietary information. On information and belief, the materials taken by Velez and the employee defendants, included critical information regarding its customers, including contact information, and a description of their needs and preferences for marketing purposes.

24.    The information was confidential and belonged exclusively to PCH, which had compiled it over many years, and at significant cost.  It comprised vital marketing and competitive information that could cause grave damage to PCH, if placed in a competitor's hands.

25.    After the New York seminar in February of 2007, Velez quickly executed his plan to develop a new company to compete with PCH, including the development of a website that was a clone of the PCH website, offering DVDs and other publications that were clones of the TPM®.

25.    Also, prior to his termination, Defendant Velez indicated that he was planning a seminar to be held in the first week of April, 2007 in Washington, D.C., under the auspices of PCH.  Then, after his termination, Velez deceptively usurped this corporate opportunity, and made the presentation in conjunction with other corporate interests.

26.    Most of the customers of PCH initially learn the securities trading process and methodology known as the "The Pristine Method®" by attending seminars.  The basics of the

materials that are subject to registered service marks, trademarks and copyrights.

contracts, as he had executed them on behalf of PCH when the agreements were originally signed by the employee defendants' during the prior five years.

23.     In the course of his employment, Velez and the employee defendants had unfettered access to PCH's customer lists and other confidential and proprietary information. On information and belief, the materials taken by Velez and the employee defendants, included critical information regarding its customers, including contact information, and a description of their needs and preferences for marketing purposes.

24.     The information was confidential and belonged exclusively to PCH, which had compiled it over many years, and at significant cost.  It comprised vital marketing and competitive information that could cause grave damage to PCH, if placed in a competitor's hands.

25.     After the New York seminar in February of 2007, Velez quickly executed his plan to develop a new company to compete with PCH, including the development of a website that was a clone of the PCH website, offering DVDs and other publications that were clones of the TPM®.

25.     Also, prior to his termination, Defendant Velez indicated that he was planning a seminar to be held in the first week of April, 2007 in Washington, D.C., under the auspices of PCH.  Then, after his termination, Velez deceptively usurped this corporate opportunity, and made the presentation in conjunction with other corporate interests.

26.     Most of the customers of PCH initially learn the securities trading process and methodology known as the  "The Pristine Method®" by attending seminars.  The basics of the

materials that are subject to registered service marks, trademarks and copyrights.

27.     PCH offers two different seminars for different levels of expertise. Defendants Velez and VCM have fully co-opted one of the two presentations – the introduction to "The Pristine Method®". Indeed in the manual provided to VCM seminar subscribers, which Velez has denominated "Trade for Life" approximately two thirds of the written presentation consists of charts lifted directly from the manual used for introduction to "The Pristine Method®". This is the manual that is a focus of this Complaint.

28.     According to VCM's website, the next and most audacious step in Velez's brazen plan to ruin PCH, will take place next week in San Diego, California, at the San Diego Traders Expo, scheduled for June 20, 21, 22, and 23 where, if permitted to go forward, Velez will continue to illicitly deploy the stolen intellectual property previously made public at the New York Online Traders Expo, and on information and belief, other PCH property as well.

29.     On information and belief, notwithstanding their covenants not to compete, solicit and/or disclose, the employee defendants will participate in the San Diego event as well.

30.     Velez's actions have caused disruption and confusion among PCH's staff; its client base, lists of which Velez illicitly spirited out of the firm prior to his termination, and the public. His acts have lessened corporate morale, and in addition to the defendant employees' departure, one other important employee has left. These departures have cost PCH at least a million dollars in revenues, and in a small company like PCH, with less than twenty professionals on staff in its educational subsidiary at the beginning of the year, a 25% loss in key employees is a substantial one.

"His 'Trade for Life' seminars and five day live trading sessions have been attended by more than 60,000 traders all

27.    PCH offers two different seminars for different levels of expertise.  Defendants Velez and VCM have fully co-opted one of the two presentations – the introduction to "The Pristine Method®".  Indeed in the manual provided to VCM seminar subscribers, which Velez has denominated "Trade for Life" approximately two thirds of the written presentation consists of charts lifted directly from the manual used for introduction to "The Pristine Method®".  This is the manual that is a focus of this Complaint."

28.    According to VCM's website, the next and most audacious step in Velez's brazen plan to ruin PCH, will take place next week in San Diego, California, at the San Diego Traders Expo, scheduled for June 20, 21, 22, and 23 where, if permitted to go forward, Velez will continue to illicitly deploy the stolen intellectual property previously made public at the New York Online Traders Expo, and on information and belief, other PCH property as well.

29.    On information and belief, notwithstanding their covenants not to compete, solicit and/or disclose, the employee defendants will participate in the San Diego event as well.

30.    Velez's actions have caused disruption and confusion among PCH's staff; its client base, lists of which Velez illicitly spirited out of the firm prior to his termination, and the public.  His acts have lessened corporate morale, and in addition to the defendant employees' departure, one other important employee has left.  These departures have cost PCH at least a million dollars in revenues, and in a small company like PCH, with less than twenty professionals on staff in its educational subsidiary at the beginning of the year, a 25% loss in key employees is a substantial one.

"His 'Trade for Life' seminars and five day live trading sessions have been attended by more than 60,000 traders all

over the world...."

The statement and its purpose is at the core of this lawsuit. Velez has not presented to 60,000 people; the PCH organization and its team of instructors accomplished that feat over the last decade, using the "The Pristine Method®", not the newly spawned "Trade for Life" ripoff that Velez is presently relying upon.

32.    This intentionally confusing statement is an attempt to exploit the goodwill and registered service marks of "TPM®". Also, by creating a website and promotional material that trumpets Velez's prior connection with PCH in a misleading manner, VCM further contributes to confusion among the public, especially the part that constitutes PCH's customer base.

33.    Velez is also interfering with PCH's advantageous business relations, particularly with its publisher, who, as a result of misleading statements and pressure by Velez, has placed a moratorium on the publishing and promoting of certain PCH merchandise that had been produced less than two weeks ago at significant expense, and is ready to be marketed.

34.    In sum, Velez and VCM are unfairly competing by using PCH's client lists, photocopies of TPM® materials, intellectual property, business contacts, goodwill, and former personnel who are in breach of employment agreements that were negotiated by Velez himself, on behalf of PCH, all with the intent to confuse the public to Velez and VCM's advantage.

35.    To redress the injuries it has suffered, PCH seeks *inter alia* immediate

information, an immediate accounting of all revenue derived from PCH's customers, and

over the world...."

The statement and its purpose is at the core of this lawsuit.  Velez has not presented to 60,000

people; the PCH organization and its team of instructors accomplished that feat over the last

decade, using the "The Pristine Method®", not the newly spawned "Trade for Life" ripoff

that Velez is presently relying upon.

32.    This intentionally confusing statement is an attempt to exploit the goodwill and

registered service marks of "TPM®".  Also, by creating a website and promotional material

that trumpets Velez's prior connection with PCH in a misleading manner, VCM further

contributes to confusion among the public, especially the part that constitutes PCH's customer

base.

33.    Velez is also interfering with PCH's advantageous business relations,

particularly with its publisher, who, as a result of misleading statements and pressure by

Velez, has placed a moratorium on the publishing and promoting of certain PCH merchandise

that had been produced less than two weeks ago at significant expense, and is ready to be

marketed.

34.    In sum, Velez and VCM are unfairly competing by using PCH's client lists,

photocopies of TPM® materials, intellectual property, business contacts, goodwill, and

former personnel who are in breach of employment agreements that were negotiated by Velez

himself, on behalf of PCH, all with the intent to confuse the public to Velez and VCM's

advantage.

35.    To redress the injuries it has suffered, PCH seeks *inter alia*, immediate

information, an immediate accounting of all revenue derived from PCH's customers, and

expedited discovery.

36.    By virtue of the facts set forth herein, PCH seeks to redress its injuries through emergent; equitable relief, and under several causes of action – including immediate injunctive relief enjoining all of the Defendants from presenting the "Trade for Life" seminars or offering for sale related product, at the upcoming San Diego Traders Expo or anywhere else; an immediate return of all materials taken from PCH during the employment of Velez and the employee defendants; immediate injunctive relief as to the enforcement of the employee defendants' breaches of covenants not to compete, not to solicit, and not to reveal confidential information; monetary compensation for breach of the duty of loyalty, for tortious interference with prospective economic advantage, for tortious interference with advantageous relations and contracts, for conversion, and for misappropriation of confidential information.

37.    Upon a plenary hearing PCH will also seek permanent injunctive relief, compensatory and punitive damages, common law remedies, and contractual remedies, including attorney's fees as provided in the employee defendants' employment contracts.

### Jurisdiction and Venue

38.    Jurisdiction is conferred on this Court by 28 U.S.C. § 1331 and arises under the Trademark Act of 1946 as amended, 15 U.S.C 1114(1).

39.    Venue lies in this district pursuant to 28 U.S.C. § 1391(a) because most of the defendants are subject to personal jurisdiction in this district, many of the individual defendants reside in this district, and a substantial part of the events giving rise to PCH's

9

expedited discovery.

36.    By virtue of the facts set forth herein, PCH seeks to redress its injuries through emergent, equitable relief, and under several causes of action – <u>including immediate injunctive relief enjoining all of the Defendants from presenting the "Trade for Life" seminars or offering for sale related product, at the upcoming San Diego Traders Expo or anywhere else;</u> an immediate return of all materials taken from PCH during the employment of Velez and the employee defendants; immediate injunctive relief as to the enforcement of the employee defendants' breaches of covenants not to compete, not to solicit, and not to reveal confidential information; monetary compensation for breach of the duty of loyalty, for tortious interference with prospective economic advantage, for tortious interference with advantageous relations and contracts, for conversion, and for misappropriation of confidential information.

37.    Upon a plenary hearing PCH will also seek permanent injunctive relief, compensatory and punitive damages, common law remedies, and contractual remedies, including attorney's fees as provided in the employee defendants' employment contracts.

**Jurisdiction and Venue**

38.    Jurisdiction is conferred on this Court by 28 U.S.C. § 1331 and arises under the Trademark Act of 1946 as amended, 15 U.S.C 1114(1).

39.    Venue lies in this district pursuant to 28 U.S.C. § 1391(a) because most of the defendants are subject to personal jurisdiction in this district, many of the individual defendants reside in this district, and a substantial part of the events giving rise to PCH's

9

## FIRST CAUSE OF ACTION
## (Violation of 15 U.S.C. Section 1125 (a))

40.    For over a decade, PCH, and "The Pristine Method®" ("TPM®") have set the standard for the education of active securities traders around the world. The resources and methods used are all subject to registered service, trademarks and copyrights. VCM and Velez, through repeated reference, and by cloning TPM® for his own use, are causing great confusion among the trading community and the public at large, to the detriment of PCH.

## SECOND CAUSE OF ACTION
## (Unfair Competition)

41.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

42.    Through both documented conduct, and on information and belief, defendants have engaged in a variety of acts, including the conversion of confidential information owned by PCH to the use of VCM, in bad faith and with intent to injure, weaken or destroy PCH's rights in the TPM® and other marks, and to appropriate highly valuable goodwill belonging to PCH.

## THIRD CAUSE OF ACTION
## (Breach of Contract and the Covenants Not to Compete, Not to Solicit and Not to Disclose Confidential Information as to Defendants Lange, Oritz and Cina)

43.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.


confidential information during their employment by PCH or for one year after their departure

## FIRST CAUSE OF ACTION
### (Violation of 15 U.S.C. Section 1125 (a))

40.    For over a decade, PCH, and "The Pristine Method®" ("TPM®") have set the standard for the education of active securities traders around the world. The resources and methods used are all subject to registered service, trademarks and copyrights. VCM and Velez, through repeated reference, and by cloning TPM® for his own use, are causing great confusion among the trading community and the public at large, to the detriment of PCH.

## SECOND CAUSE OF ACTION
### (Unfair Competition)

41.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

42.    Through both documented conduct, and on information and belief, defendants have engaged in a variety of acts, including the conversion of confidential information owned by PCH to the use of VCM, in bad faith and with intent to injure, weaken or destroy PCH's rights in the TPM® and other marks, and to appropriate highly valuable goodwill belonging to PCH.

## THIRD CAUSE OF ACTION
### (Breach of Contract and the Covenants Not to Compete, Not to Solicit and Not to Disclose Confidential Information as to Defendants Lange, Oritz and Cina)

43.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

confidential information during their employment by PCH or for one year after their departure

10

from PCH.

45. The employee defendants have breached their covenants: 1) by joining VCM, a direct competitor firm; and 2) by soliciting current and former PCH customers and employees.

46. The employee defendants have breached their covenants by the defendant employees not to disclose confidential PCH information obtained during that employment or for one year after termination of that employment except in connection with their employment by PCH.

47. The Defendant employees have violated the covenant not to use or disclose confidential information by using confidential information, including but not limited to customer lists, pricing structures and stock trading processes, and TPM® to solicit current PCH customers.

48. Plaintiff has therefore been damaged in an amount as yet undetermined and is entitled to compensation therefore, compensation as well as for the salary paid by PCH to the employee defendants for all periods of time during which they were in breach of their covenants not to compete and not to use or disclose confidential information.

## FOURTH CAUSE OF ACTION
### (Breach of the Duty of Loyalty as to Defendant Velez)

49. Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

50. Defendant Velez owed a duty of loyalty and other fiduciary duties to PCH as

51. By commencing, surreptitiously, the formation of Defendant VCM while still

from PCH.

45.    The employee defendants have breached their covenants: 1) by joining VCM, a direct competitor firm; and 2) by soliciting current and former PCH customers and employees.

46.    The employee defendants have breached their covenants by the defendant employees not to disclose confidential PCH information obtained during that employment or for one year after termination of that employment except in connection with their employment by PCH.

47.    The Defendant employees have violated the covenant not to use or disclose confidential information by using confidential information, including but not limited to customer lists, pricing structures and stock trading processes, and TPM® to solicit current PCH customers.

48.    Plaintiff has therefore been damaged in an amount as yet undetermined and is entitled to compensation therefore, compensation as well as for the salary paid by PCH to the employee defendants for all periods of time during which they were in breach of their covenants not to compete and not to use or disclose confidential information.

## FOURTH CAUSE OF ACTION
### (Breach of the Duty of Loyalty as to Defendant Velez)

49.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

50.    Defendant Velez owed a duty of loyalty and other fiduciary duties to PCH as

51.    By commencing, surreptitiously, the formation of Defendant VCM while still

11

employed by PCH, and as a 47% owner of PCH, and by inducing the employee defendants to breach their PCH employment contracts and the non-compete, non-solicitation, and non-disclosure, Velez breached his duty of loyalty to PCH.

52.    By performing work for defendant VCM while employed by PCH, Velez breached his duty of loyalty to PCH.

53.    By providing confidential PCH information to defendant VCM, which is in direct competition with PCH, Velez breached his duty of loyalty to PCH.

54.    Defendant Velez committed the acts described in this Complaint in part with the intent to harm PCH.

55.    Plaintiff has therefore been damaged in an amount as yet undetermined and is entitled to compensation therefore.

### FIFTH CAUSE OF ACTION
**(Tortious Interference with Prospective Economic Advantage as to Defendants Velez, Lange, Ortiz and Cina)**

56.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

57.    In order to solicit and enter into contracts with current and former PCH customers, and in order to provide service to those customers, Defendant Velez and the employee Defendants intentionally and maliciously used confidential PCH information, including but not limited to customer lists and pricing structures.

58.    As a result of the intentional and malicious use by Defendant Velez and the

their relationships with PCH and/or entered into relationships with defendant VCM.

12

employed by PCH, and as a 47% owner of PCH, and by inducing the employee defendants to breach their PCH employment contracts and the non-compete, non-solicitation, and non-disclosure, Velez breached his duty of loyalty to PCH.

52.    By performing work for defendant VCM while employed by PCH, Velez breached his duty of loyalty to PCH.

53.    By providing confidential PCH information to defendant VCM, which is in direct competition with PCH, Velez breached his duty of loyalty to PCH.

54.    Defendant Velez committed the acts described in this Complaint in part with the intent to harm PCH.

55.    Plaintiff has therefore been damaged in an amount as yet undetermined and is entitled to compensation therefore.

**FIFTH CAUSE OF ACTION**
**(Tortious Interference with Prospective Economic Advantage as to Defendants**
**Velez, Lange, Ortiz and Cina)**

56.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

57.    In order to solicit and enter into contracts with current and former PCH customers, and in order to provide service to those customers, Defendant Velez and the employee Defendants intentionally and maliciously used confidential PCH information, including but not limited to customer lists and pricing structures.

58.    As a result of the intentional and malicious use by Defendant Velez and the

their relationships with PCH and/or entered into relationships with defendant VCM.

59.    There is at least a reasonable probability that in the absence of the intentional and malicious use of confidential PCH information by defendants in the course of their solicitation of current and former PCH customers, those customers would not have terminated all or part of their relationships with PCH and would have continued their relationships with PCH.

60.    On information and belief, Defendant and the employee Defendants have used confidential information to solicit PCH customers with the intent to harm PCH.

61.    Plaintiff has therefore been damaged in an amount as yet undetermined and is entitled to compensation therefore, punitive damages and injunctive relief.

## SIXTH CAUSE OF ACTION
### (Conversion as to all Defendants)

62.    By providing PCH intellectual property and confidential information to defendant VCM customers and prospective customers without authorization from PCH, the defendants have deprived PCH of the revenues from the sale of DVD's and revenues from the sale of seminar admissions and other compensation.  Plaintiff therefore has been and continues to be damaged in an amount as yet undetermined and is entitled to compensation therefore, and injunctive relief.

## SEVENTH CAUSE OF ACTION
### (Faithless servant)

63.    Defendant Velez's conduct is that of a faithless servant under New York law and he must disgorge all salaries and profits earned both prior to and after his termination

there is no adequate remedy at law.

59.    There is at least a reasonable probability that in the absence of the intentional and malicious use of confidential PCH information by defendants in the course of their solicitation of current and former PCH customers, those customers would not have terminated all or part of their relationships with PCH and would have continued their relationships with PCH.

60.    On information and belief, Defendant and the employee Defendants have used confidential information to solicit PCH customers with the intent to harm PCH.

61.    Plaintiff has therefore been damaged in an amount as yet undetermined and is entitled to compensation therefore, punitive damages and injunctive relief.

## SIXTH CAUSE OF ACTION
### (Conversion as to all Defendants)

62.    By providing PCH intellectual property and confidential information to defendant VCM customers and prospective customers without authorization from PCH, the defendants have deprived PCH of the revenues from the sale of DVD's and revenues from the sale of seminar admissions and other compensation. Plaintiff therefore has been and continues to be damaged in an amount as yet undetermined and is entitled to compensation therefore, and injunctive relief.

## SEVENTH CAUSE OF ACTION
### (Faithless servant)

63.    Defendant Velez's conduct is that of a faithless servant under New York law and he must disgorge all salaries and profits earned both prior to and after his termination

there is no adequate remedy at law.

13

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff respectfully requests that this Court grant the following relief:

    A.    On all of PCH's Causes of Action, economic and compensatory damages in an amount in excess of $1,000,000, the exact amount to be proven at trial.

    B.    On all of PCH's Causes of Action, punitive damages in an amount not less than $100,000 on each claim.

    C.    A temporary restraining order, preliminary injunction and permanent injunction:

        1.    Directing all Defendants not to use materials obtained from PCH, including but not limited to materials taken from "The Pristine Method®" manual, and from using the "Trade for Life" manual, including any excerpts or materials therefrom, at the San Diego Traders Expo during the period June 20, 21, 22, and 23, 2007;

        2.    Directing all Defendants to immediately Cease and Desist from copying and plagiarizing Plaintiffs' copyrighted and trademarked material, and registered service marks, including but not limited to The Pristine Method®;

        3.    Directing all Defendants to immediately Cease and Desist from copying and plagiarizing materials copyrighted and trademarked by Plaintiffs and presenting them to the public as "Trade for Life" by Velez Capital Management;

        4.    Directing all Defendants to immediately Cease and Desist from hiring Plaintiffs' employees in breach of their employment agreements with PCH;

        5.    Directing all Defendants to immediately Cease and Desist from breaching the employment agreements of Defendants Paul Lange, Saul Ortiz-Stevens, and Stephen Cina, which contain restrictive covenants at

year after their employment terminates with PCH; and from ever disclosing the Confidential Information of PCH.

14

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff respectfully requests that this Court grant the following relief:

A.      On all of PCH's Causes of Action, economic and compensatory damages in an amount in excess of $1,000,000, the exact amount to be proven at trial.

B.      On all of PCH's Causes of Action, punitive damages in an amount not less than $100,000 on each claim.

C.      A temporary restraining order, preliminary injunction and permanent injunction:

1.      Directing all Defendants not to use materials obtained from PCH, including but not limited to materials taken from "The Pristine Method®" manual, and from using the "Trade for Life" manual, including any excerpts or materials therefrom, at the San Diego Traders Expo during the period June 20, 21, 22, and 23, 2007;

2.      Directing all Defendants to immediately Cease and Desist from copying and plagiarizing Plaintiffs' copyrighted and trademarked material, and registered service marks, including but not limited to The Pristine Method®;

3.      Directing all Defendants to immediately Cease and Desist from copying and plagiarizing materials copyrighted and trademarked by Plaintiffs and presenting them to the public as "Trade for Life" by Velez Capital Management;

4.      Directing all Defendants to immediately Cease and Desist from hiring Plaintiffs' employees in breach of their employment agreements with PCH;

5.      Directing all Defendants to immediately Cease and Desist from breaching the employment agreements of Defendants Paul Lange, Saul Ortiz-Stevens, and Stephen Cina, which contain restrictive covenants at

year after their employment terminates with PCH; and from ever disclosing the Confidential Information of PCH.

14

6.     Directing all Defendants to immediately Cease and Desist from presenting to current and future customers "The Pristine Method®" and other registered and trademarked materials;

7.     Directing Velez and VCM to provide an accounting of all revenues of VCM to date, broken down by product category;

8.     Directing Velez and VCM to disgorge all salaries and profits, and all Defendants to return all PCH materials removed during the period of Defendants' employment, and to identify and erase and/or return as applicable, all electronic records taken from PCH during the period of Defendants' employment; .

9.     Directing Velez and VCM to cease and desist from interfering with the business relationship between PCH and Traders Library, and from directing Traders Library not to withhold the publishing and distribute for sale of any PCH materials.

10.     Permitting plaintiff to conduct expedited "discovery".

**JURY DEMAND**

Plaintiff demands a trial by jury.

Respectfully submitted,

By: _____

Dan A. Druz

Dated: June 13, 2007

**CERTIFICATION**

I hereby certify that the matter in controversy is not the subject of any other court, arbitration or administrative proceeding.

15

6.     Directing all Defendants to immediately Cease and Desist from presenting to current and future customers "The Pristine Method®" and other registered and trademarked materials;

7.     Directing Velez and VCM to provide an accounting of all revenues of VCM to date, broken down by product category;

8.     Directing Velez and VCM to disgorge all salaries and profits, and all Defendants to return all PCH materials removed during the period of Defendants' employment, and to identify and erase and/or return as applicable, all electronic records taken from PCH during the period of Defendants' employment; .

9.     Directing Velez and VCM to cease and desist from interfering with the business relationship between PCH and Traders Library, and from directing Traders Library not to withhold the publishing and distribute for sale of any PCH materials.

10.    Permitting plaintiff to conduct expedited "discovery".

## JURY DEMAND

Plaintiff demands a trial by jury.

Respectfully submitted,

By: _____

Dan A. Druz

Dated: June 13, 2007

## CERTIFICATION

I hereby certify that the matter in controversy is not the subject of any other court, arbitration or administrative proceeding.

15



**FINRA Dispute Resolution**

Northeast Region
One Liberty Plaza | 165 Broadway, 27th Floor | New York NY | 10006-1400 | 212 858 4200 | Fax 301 527 4873



September 14, 2007

Oliver L. Velez
14 Richbell Road
White Plains, NY  1065

Subject:    FINRA Dispute Resolution Arbitration Number 07-02396
Greg Capra and Pristine Capital Holdings Inc. v. Oliver L. Velez.

Dear Mr. Velez:

FINRA Dispute Resolution provides a forum for the resolution of disputes involving public investors and broker-dealers, and members of the American Stock Exchange (AMEX), International Stock Exchange (ISE), Nasdaq Liffe Markets (NqLX), and Philadelphia Stock Exchange (PHLX), and Municipal Securities Rulemaking Board (MSRB) registrants and/or their associated persons.

Please be advised that the Securities and Exchange Commission (SEC) has approved the NASD Codes of Arbitration Procedure for Customer (Customer Code) and Industry (Industry Code) Disputes. The Customer and Industry Codes become effective on April 16, 2007 and apply to all claims filed on or after the effective date. Please note that the list selection provisions of the new Customer or Industry Codes will apply to previously filed claims in which a list of arbitrators has not yet been generated and sent to the parties, or in which an entirely new list of arbitrators must be generated. In these cases, even though a list has been generated under the new Customer or Industry Code, the claim will continue to be governed by the remaining provisions of the old Code of Arbitration Procedure (Old Code) unless all parties agree to proceed under the new Customer or Industry Code.

The claim was filed on or after April 16, 2007, therefore the case will be governed by the Customer/Industry Code.

This office administers cases according to the procedures set forth in NASD Rules. The most up-to-date version of the rules can be accessed or downloaded from our Web site at http://www.finra.org. On the FINRA Dispute Resolution Web site, you will also find important instructions concerning filing your answer or other claims (The FINRA Dispute Resolution Party's Reference Guide). If you do not have access to the Internet, you may call our office to request a copy of these documents.

<u>**Filing a Statement of Answer**</u>

Since you have been named as a party in this arbitration, enclosed is a copy of the Statement of Claim. However, since you have not signed an agreement to arbitrate, your submission to arbitration must be voluntary. Please inform us in writing if you refuse to submit to arbitration.

If you decide to file a Statement of Answer:

1.    Your Statement of Answer must specify all relevant facts and available defenses to the Statement of Claim submitted (See NASD Rules[1]).

2.    Your Answer may include any related claim(s) that you may have against the claimant or any other party subject to arbitration under the rules. If you assert any of these claims please refer to the Schedule of Fees[2] for the related filing fee. If you assert a claim, it should be submitted with the fee in the attached envelope.

3.    Pursuant to NASD Rules,[3] you are required, no later than November 5, 2007, to send to the Claimant and all other parties, a signed Uniform Submission Agreement (form enclosed) and your Answer. Claimant or Claimant's counsel's address is provided at the end of this service letter.

4.    NASD Rules also require that you send to the Director of Arbitration: (a) the original and three copies of the Uniform Submission Agreement, properly signed and dated by you; (b) the original and three copies of your Answer; and (c) four copies of any document(s) referred to in your Answer. When sending copies of your Answer to the Director of Arbitration, please indicate that you have properly served your Answer on all parties. If you need an extension of time to file your Statement of Answer, you may contact the Claimant directly and request one. If Claimant agrees to extend your time to file your Answer, please notify FINRA in writing of the new deadline for filing your Answer. You should also send a copy of that notice to the Claimant and all other parties.

## Hearing Location

If an arbitration involves a public customer, FINRA Dispute Resolution will generally select a hearing location closest to the customer's residence at the time the dispute arose.[4]

In disputes between member firms, MSRB registrants and associated persons, FINRA Dispute Resolution will select the hearing location that is closest to the location where the associated person was employed at the time the dispute arose.

In industry disputes involving only member firms and/or MSRB Registrants unless the member firms are in the same locale or the parties agree to a specific hearing location, FINRA Dispute Resolution will consider the following factors when deciding the hearing location:

[1] Customer Code Rule 12303
Industry Code Rule 13303
Old Code Rule 10314(b)

[2] Customer Code Rule 12900
Industry Code Rule 13900
Old Code Rule 10332

[3] Customer Code Rule 12303
Industry Code Rule 13303
Old Code Rule 10314(b)

[4] Customer Code Rule 12213
Industry Code Rule 13213

1)    Which party initiated the transactional issue;
2)    The location of witnesses and documents; and
3)    The relative hardship for travel of a party to a specific location.

The **ANTICIPATED** hearing location of this case is: New York City, New York. This preliminary decision was made, pursuant to NASD Rules,[5] by me, acting on behalf of the Director of Arbitration. A final decision regarding the initial hearing location will be rendered before the Panel is being appointed. In addition, NASD Rules[6] authorize the presiding Panel to determine the time and place of all subsequent hearing(s).

If the anticipated initial hearing location listed above is **UNKNOWN**, FINRA Dispute Resolution is requesting recommendations from all parties for the hearing location based on the above applicable guidelines.

## Other Information

If, after reading NASD Rules and "FINRA Dispute Resolution Party's Reference Guide" booklet, you still have questions regarding FINRA Dispute Resolution arbitration, please contact us. When contacting me, please refer to the number assigned to this case, which is 07-02396. FINRA Dispute Resolution encourages the parties to communicate among themselves to resolve issues that do not require FINRA Dispute Resolution intervention.

Pursuant to Article V, Section 2(c) of the FINRA By-Laws, if you are a registered representative with the FINRA, you are required to keep your registration application current. You are, therefore, advised to review the Form U-4 to determine if disclosure of this matter is required. If so, your failure to update your registration application may result in the filing of a formal complaint based on any omission. Any questions regarding this disclosure requirement should be directed to the FINRA Member Services Phone Center (301) 590-6500.

## Discovery

In disputes involving customers, for assistance with discovery, please review the attached Discovery Guidelines. In disputes involving only industry parties, for assistance with discovery, please review the applicable discovery code provisions for guidance.[7]

## Motions[8]

The time to respond to motions (other than motions to dismiss, as noted below) are governed by customer

---

[5]Customer Code Rule 12213
Industry Code Rule 13213
Old Code Rule 10315

[6]Customer Code Rule 12600
Industry Code Rule 13600
Old Code Rule 10315

[7]Industry Code Rule 13505 through and including Rule 13514

[8]For questions about motion practice under the Old Code, please contact your case administrator.

and industry code Rules 12503(b) and 13503(b), respectively:

### Responding to Motions

Parties have 10 days from the receipt of a written motion to respond to the motion, unless the moving party agrees to an extension of time, or the Director or the panel decides otherwise. Responses to written motions must be served directly on each other party, at the same time and in the same manner. Responses to written motions must also be filed with the Director, with additional copies for each arbitrator, at the same time and in the same manner in which they are served on the parties.

### Motions to Dismiss

FINRA Dispute Resolution does not have a rule that expressly addresses motions to dismiss claims before a hearing on the merits. Therefore, for cases proceeding according to the Old Code, Customer Code, or Industry Code, the response to a motion to dismiss will not be due until the panel sets a deadline for the response.


Very truly yours,



Paula Union
Case Administrator
212-858-4200 FAX:301-527-4904


PRU:HP:LC39G
idr:08/07
Enclosure
CC:
   Dan A. Druz, Esq., Greg Capra
   291 E. Main St., Suite 1000, Manasquan, NJ  08736

RECIPIENTS:
   Oliver L. Velez
   14 Richbell Road, White Plains, NY  1065