UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

OLIVER L. VELEZ

            Plaintiff,

v.

PRISTINE CAPITAL HOLDINGS INC.,
GREG CAPRA, AND FINANCIAL INDUSTRY
REGULATORY AUTHORITY,

Defendants.

_____

07-cv-08524 (AKH)


MEMORANDUM OF LAW

Preliminary statement

      This controversy involves a dispute between and among two individuals formerly licensed principals and currently associated persons of the Financial Industry Regulatory Authority ("FINRA", f/k/a "NASD") and the holding company of which they own together approximately ninety-four percent of the company's stock.  The primary question before the Court is the issue of judicial versus arbitral resolution of the dispute which arises in two ways.

      First, under the Federal Arbitration Act and the case law interpreting it, Defendants assert that a binding arbitration clause contained in the "U-4" controls the arbitrability of this matter.

      Second, Defendants assert that under the federal securities laws, broker-dealers who are member firms of a self-regulatory organization ("SRO"), along with their associated persons, are required to arbitrate their disputes pursuant to rules promulgated by the SRO.

Factual and procedural background

Defendant Pristine Capital Holdings "PCH" is a holding company and the sole owner of two subsidiaries.

One subsidiary, Pristine Services Inc. ("PSI") provides educational support and information services to active securities traders via the internet, seminars, publications, and DVDs and is considered to be a leader in the securities education industry.

The other, Mastertrader.com ("MTC") is a broker-dealer and member firm of FINRA (FINRA and NASD are used interchangeably throughout this memorandum). Because of its membership in FINRA, MTC is subject to the federal securities laws, and the rules and regulations promulgated by the Securities Exchange Commission and FINRA.

Greg Capra and Oliver Velez co-founded PCH more than ten years ago. Their percentage ownership is equal, with each owning more than forty-seven (47) percent of the outstanding shares in the company. PCH, in turn, owns 100 percent of the two subsidiary companies. Until November 2006, Velez was employed as the Chairman and CEO of PCH, and Capra was its President, a position that he continues to hold presently.

PSI, the subsidiary on the education side of PCH's business, develops new clients – investors who wish to learn how to transact profitably in the stock market. The new PSI clients are then referred to NASD member firm MTC, for execution of their transactions, if they decide to implement the knowledge provided to them for becoming self-directed traders.

This is a very significant part of the PCH business model, ***which requires NASD approval of the cross-marketing techniques utilized by the member firm, MTC, and the nonmember firm, PSI, as a condition of permitting the cross-marketing process. The regulator further required, as an ongoing condition of its approval, that Velez and Capra become registered principals of MTC and that all three parties submit to the NASD's ongoing oversight and jurisdiction regarding their marketing activities.***

All of the parties, especially Velez and Capra, who were the primary individuals involved in obtaining NASD approval of their marketing strategies, and who acted as MTC's, PSI's and PCH's principals and agents, fully comprehended the regulatory purposes that required their licensure and registration with the NASD. To meet the requirement, in 2001 they each executed a "Uniform Application for Securities Industry Registration" – the "U-4" (Exhibits "A" and "B" attached to the Certification of Greg Capra).

The Signature Page of the U-4 contains a pre-dispute arbitration agreement in it which states at Para. 5 thereof:

> I agree to arbitrate any dispute, claim or controversy that may arise between me and my firm, or a customer, or any other person, that is required to be arbitrated under the rules, constitutions, or by-laws of the *SROs* indicated in [this form] as may be amended from time to time and that any arbitration award rendered against me may be entered as a judgment in any court of competent *jurisdiction*.

In addition to an agreement to arbitrate on the Signature Page, the U-4 also states at Paragraph "2" of the Signature Page that:

> I apply for registration with the *jurisdictions* and *SROs* indicated in [this form] may be amended from time to time and, in consideration of the *jurisdictions* and *SROs* receiving and considering my application, I submit to the

> authority of the *jurisdictions* and *SROs* and agree to comply
> with all provisions, conditions and covenants of the
> statutes, constitutions, certificates of incorporation, by-laws
> and rules and regulations of the *jurisdictions* and *SROs* as
> they are or may be adopted, or amended from time to time.
> I further agree to be subject to and comply with all
> requirements, rulings, orders, directives and decisions of,
> and penalties, prohibitions and limitations imposed by the
> *jurisdictions* and *SROs*, subject to right of appeal or review
> as provided by law.

Among the rules of the NASD, (the SRO with which Velez and Capra registered),

is "The Code of Arbitration Procedure" ("the Code) which is incorporated by reference in

the U-4. Because of their indirect ownership of and registered employment status with

MTC, Velez and Capra are known by the defined term: "person associated with a

Member" or "Associated Person", defined on the FINRA website as follows:

> The term "person associated with a member" means:
> (1) A natural person registered under the Rules of the
> NASD; or
> (2) A sole proprietor, partner, officer, director, or branch manager of a
> member, or a natural person occupying a similar status or performing
> similar functions, or a natural person engaged in the investment banking or
> securities business who is directly or indirectly controlling or controlled
> by a member, whether or not any such person is registered or exempt from
> registration with NASD under the By-Laws or the Rules of NASD.
> <u>For purposes of the Code, a person formerly associated with a member is a</u>
> <u>person associated with a member.</u> (Emphasis added.)

In February of 2007, Velez and Capra resigned as registered principals with

MTC, but due to their ownership interest, continued as associated persons. Also, as noted

in the emphasized text in the immediately preceding paragraph, as persons formerly

associated with a member, for arbitration purposes, Velez and Capra continued as

associated persons even after their termination with MTC.

Pursuant to the terms of the U-4, Velez and Capra, as associated persons, are required to arbitrate all controversies between or among members, such as MTC, or themselves as associated persons, that arise from their employment relationship. Section 13200 of the Code states:

> Required Arbitration
>
> (a) Generally
> Except as otherwise provided in the Code, a dispute must be arbitrated under the Code if the dispute arises out of the business activities of a member or an associated person and is between or among:
>
> • Members;
> • Members and Associated Persons; or
> • Associated Persons.

On November 20, 2006, Respondent Velez was relieved of his executive duties as Chairman and CEO and removed as an officer and director of PCH, as a result of the discovery of his conversion of more than $250,000.00 of corporate funds to his personal use, and for other malfeasance. At the time, the parties mutually agreed that Velez would remain employed by PCH in an undefined capacity, pending an investigation into his apparent misconduct, and pending the negotiation of a schedule for the repayment by Velez of the converted funds. Indeed Velez did acknowledge and re-pay a small portion of the funds due and owing from him to PCH.

The ensuing inquiry ultimately revealed additional transgressions. From the time that he was relieved of his duties in 2006, if not earlier, Velez was surreptitiously commencing the formation of a new company, Velez Capital Management ("VCM"), that would directly compete against PCH. Velez had usurped PCH corporate opportunities on behalf of VCM, and breached other fiduciary duties to PCH as well. He had committed

major violations of company policy; he had removed, disclosed and used PCH
intellectual property without permission. He had also induced the breach of employment
contracts by key employees; contracts that he himself had previously negotiated for the
benefit of PCH.

Velez' misconduct directly, substantially and negatively impacted the business of
MTC – the NASD member firm subsidiary – as well as the business of the other
subsidiary, PSI and that of Respondent PCH, the holding company. Consequently, he
was terminated by PCH on February 21, 2007.

PCH and Capra then filed an arbitration proceeding against Velez, at FINRA
Dispute Resolution (FINRA's arbitration facility) pursuant to the terms of the arbitration
agreement contained in the U-4, on or about August 27, 2007, seeking redress for the
damages Velez caused.

Ultimately, because Velez was a licensed principal of MTC, and because of the
nature of his termination in February 2007, and subsequent events, it triggered a
mandatory, internal regulatory review and related filings with FINRA.

To date, Velez refuses to comply with regulatory requirements and inquiries
related to his termination, to which he voluntarily submitted when he executed the U-4.

On August 27, 2007, PCH and Capra filed a Statement of Claim detailing Velez'
misconduct and demanding return of the converted funds, and compensation for the
damages caused by Velez' breaches of fiduciary duties, inducement of breaches of
employment contracts by key employees, punitive damages, legal fees and injunctive
relief, which include but are not limited to a Panel Order compelling Velez to comply

with the regulatory inquiries triggered by his misconduct, related termination, and subsequent events.

On September 21, 2007, Velez petitioned the Supreme Court of New York in New York County to permanently enjoin the arbitration controversy that had been filed by Defendants with FINRA Dispute Resolution as FINRA Arbitration Number 07-2396, from proceeding.

On October 2, 2007, PCH and Capra filed a Notice of Removal with the Clerk of the Southern District of New York and the Clerk of the Supreme Court of New York for New York County.

<u>Argument</u>

I.  In the first instance,
arbitrators, not Courts, decide
<u>certain questions of "arbitrability"</u>

The U.S. Supreme Court has decided that "'procedural' questions which grow out of the dispute and bear on its final disposition" are presumptively *not* for the judge, but for an arbitrator, to decide. <u>John Wiley & Sons, Inc. v. Livingston</u>, 376 U.S.543, 557 (holding that an arbitrator should decide whether the first two steps of a grievance procedure were completed, where these steps are prerequisites to arbitration). So, too, the presumption is that the arbitrator should decide "allegation[s] of waiver, delay, or a like defense to arbitrability." <u>Moses H. Cone Memorial Hospital v. Mercury Construction Corp</u>, 460 U.S. 1, 24-25. Indeed, the Revised Uniform Arbitration Act of 2000 (RUAA), seeking to "incorporate the holdings of the vast majority of state courts and the law that has developed under the [Federal Arbitration Act]," states that an "arbitrator shall decide whether a condition precedent to arbitrability has been fulfilled." RUAA § 6(c), and

comment 2, 7 U.L.A. 12-13 (Supp. 2002). And the comments add that "in the absence of an agreement to the contrary, issues of substantive arbitrability . . . are for a court to decide and issues of procedural arbitrability…[such as the satisfaction of] conditions precedent to an obligation to arbitrate have been met, are for the arbitrators to decide." *Id.*, § 6, comment 2, 7 U.L.A., at 13 (emphasis added).

In this matter, the condition precedent to the arbitrability of the dispute, is the determination of the parties to the arbitration agreement. The holding company, PCH, is a nonsignatory to the arbitration agreement. On the other hand, Capra and Plaintiff Velez, the controlling principals and direct co-owners of 94% of PCH both executed the agreement, and have previously invoked the agreement in another controversy in 2003 (NASD Arbitration Case No. 03-06185 that included all of their companies: PCH, PSI and MTC as well as themselves (Capra Certification, Paragraph "9")).

It is incontrovertible that Capra may compel Velez to arbitration pursuant to the rules and regulations of FINRA, as they are both associated persons under the Code and personally executed the U-4. The question then is whether they also bound their holding company, PCH, to the arbitration agreement. Put another way, did they mean to include PCH in the meaning of "member firm" that is set forth in the Code Section 13200 cited *supra*.

Bearing in mind that all of the parties, specifically PCH, Velez and Capra all previously invoked the very same arbitration clause to bring suit in a prior arbitration proceeding against another party, it must be determined whether PCH has since acted in a manner to repudiate the very contract that it previously embraced. That is, has it since acted in a manner to "waive" the contract's arbitration provision?

8

Before that issue may be determined, the "gateway" question then is: who will determine whether PCH may invoke or is bound by the arbitration clause, a court or an arbitration panel? To decide this issue, one needs to first analyze Code Section 13200 (set forth *supra*) and determine whether the parties intended to include PCH, as the parent company, in the definition of the parties bound to arbitrate their disputes.

> "…NASD arbitrators [,] are comparatively more expert about the meaning of their own rule, are comparatively better able to interpret and to apply it.… and [it is reasonable] for the law to assume an expectation that aligns (1) decisionmaker with (2) comparative expertise will help better to secure a fair and expeditious resolution of the underlying controversy… *Howsam v. Dean Witter,* 537 U.S. 79, 85. "[P]arties to an arbitration contract would normally expect a forum-based decisionmaker to decide forum specific procedural gateway matters. *Id. 86.*

Under *Howsam*, respectfully, it seems clear that the FINRA <u>arbitrators</u> should determine the reach of their own jurisdiction over parties, <u>not this Court</u>.

> "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* <u>460 U.S. 1</u>, <u>24-25</u>

However, should this Court find that it, not arbitrators, must decide the question of arbitrability notwithstanding the arguments of the Defendants, the controversy must still be compelled by a court to NASD arbitration, as follows.

II. There exists a valid agreement to arbitrate between and among the <u>parties.</u>

A. <u>The U-4</u>

As noted *supra*, the U-4 contains an arbitration clause that binds the

parties to it to arbitrate their controversies.  Both Velez and Capra executed a U-4 in June

of 2001.

> B.. The arbitration agreement
> contained in Velez' U-4 survives
> his termination by PCH

'Black letter' arbitration case law holds that a party is obligated to arbitrate

securities industry related disputes regardless of whether he is currently registered with a

member firm. O'Neel v. Nat'l Ass'n of Secs. Dealers, Inc. 667 F.2d 804.  Equally

applicable here, the O'Neel court stated that:

> "It would seem strange indeed that with such a
> significant integrated method of dispute settlement one
> party could frustrate the purpose of the Exchange rules
> and a federal policy favoring arbitration by the mere
> expediency of resignation from the Exchange. *Id., 806-
> 07.*

Indeed, wholly expert with this area of the law, and without an agenda regarding this

dispute, FINRA Dispute Resolution made this very same determination as well, and

advised Velez of the compulsory nature of the abitrability of this dispute by

correspondence dated September 21, 2007, stating, "you are required by the rules of

FINRA Dispute Resolution to arbitrate this matter."        (See Exh.  )

III.  PCH, as a nonsignatory, may
invoke the arbitration agreement
executed by Velez and Capra

In the New York Court of Appeals opinion in First Boston Corp. v. Pitofsky 4

N.Y. 3d 149, 158[fn3], the Court references the decision in In re Prudential Litig. All

Agent Actions, 133 F3d 225 (3d Cir 1998), where the federal court found that an

employer that was also a holding company for a member firm as here, had standing to

compel arbitration under a Form U-4, although not a signatory to the agreement. The facts underlying that ruling are analogous to the circumstances here.

In deciding whether to compel a matter to arbitration under the Federal Arbitration Act, 9 U.S.C. 1 et seq., the first inquiry is to determine, pursuant to recognized principles of contract law, the validity of, and the parties bound by, the arbitration agreement. As explained by the Supreme Court, "'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" AT&T Technologies v. Communications Workers of America,et al., 475 U.S. 643, 648 (1986) (quoting United Steelworkers of America v. Warrior and Gulf Navigation Co., 363 U.S. 574,582 (1960)). The identification of the parties bound by the agreement to arbitrate need not be confined to the limited inquiry of identifying the signatories to the arbitration agreement. [Emphasis added.] Instead, the dispositive finding is an "'express' and 'unequivocal'" agreement between parties to arbitrate their disputes. Kaplan v. First Options of Chicago, Inc., 19 F.3d 1503, 1512 (3d Cir. 1994) (citations omitted), aff'd, 514 U.S. 938 (1995).

The federal court continued: "a variety of non-signatories to arbitration agreements have been held to be bound by such agreements under ordinary common law contract and agency principles." Barrowclough v. Kidder, Peabody & Co., Inc., 752 F.2d 923, 938 (1985) (citations omitted), overruled on other grounds by Pritzker v. Merrill Lynch, Pierce, Fenner & Smith,Inc., 7 F.3d 1110, 1112 (3d Cir. 1993).

In fact, courts apply third party beneficiary law in examining the contractual standing of a non-signatory party to a dispute, provided there is an expression of the requisite intent between the third party and the plaintiff to arbitrate their claims. See

11

McPheeters v. McGinn, Smith & Co., 953 F.2d 771, 772-73 (2d Cir. 1992) (per curiam);
Nesslage v. York Sec., Inc., 823 F.2d 231, 233-34 (8th Cir. 1987); Letizia v. Prudential
Bache Sec., Inc., 802 F.2d 1185, 1187 (9th Cir. 1986); Mowbray v. Moseley, Hallgarten,
Estabrook & Weeden, Inc., 795 F.2d 1111, 1116-17 (1st Cir. 1986); Stone v.
Pennsylvania Merchant Group, Ltd., 949 F. Supp. 316, 320-21 (E.D.Pa. 1996).

      The parties here do not contest the validity of the arbitration clause itself.
Instead, they dispute the identity of the parties who are bound by the Form U-4 executed
by Velez and Capra.  Reviewing the text of the Form U-4 arbitration agreement, the
circumstances surrounding its execution, and its prior invocation by the parties here in
another proceeding, it is clear that there is an express and unequivocal intent that Velez
would arbitrate any claims involving PCH, and that "both parties to the contract
express[ed] an intention to benefit the third party [PCH] in the contract itself. . . ."
Scarpitti v. Weborg, 530 Pa. 366, 372-73, 609 A.2d 147, 150 (1992); see also the
Restatement (Second) of Contracts Section(s) 302(1)(b) (1981).

      Indeed, previously in his Memorandum of Law in support of his petition before
the Supreme Court of New York, Velez argued that "Petitioner had no role in the
management of Pristine Securities; his role in Pristine Securities was solely limited to
that of a capital contributor or capital participant – a role that did not require him to
register with Pristine Securities [MTC]." **That is an absolutely misleading and
inaccurate statement.**

      As noted, in order to increase business at both subsidiaries – at member firm
broker-dealer MTC, and at nonmember firm PSI – the NASD required that Velez become
a licensed principal and associated person of MTC.  His activities on behalf of the

subsidiary, PSI, had a direct and immediate impact on the business of MTC, but even if

Velez' contention was correct – which it is not – that he was not compelled to execute the

U-4 under these circumstances, he did, in fact, execute it nonetheless, to increase the

revenues of both companies, of which he was the principal owner along with Capra.

Having willingly executed it, he is bound by its terms, as is PCH, of which he was an

owner and employee, and a principal, and for whom he acted as both principal and agent

in his dealings with the NASD.

Because Velez' activities that led to his termination by PCH were deleterious to

the business of the three related business entities, the conduct clearly falls within the

scope of the arbitration agreement that incorporated the FINRA Industry Code of

Arbitration Procedures which states:

### 10201. Required Submission

(a) …. a dispute, claim, or controversy eligible for submission under the [Code] between or among members and/or associated persons, and/or certain others, arising in connection with the business of such member(s) or in connection with the activities of such associated person(s), or arising out of the employment or termination of employment of such associated person(s) with such member, shall be arbitrated under this Code, at the instance of:
(1) a member against another member;
(2) a member against a person associated with a member or a person associated with a member against a member; and
(3) a person associated with a member against a person associated with a member.
(Emphasis added.)

To reiterate, Velez became registered with the NASD, at PCH's direction, and

for its benefit, in order to increase business at both MTC and PSI, its two subsidiaries.

Together those two entities fully comprise PCH, and Velez and Capra together own more than 94% of the holding company.

In other words, the real individual parties in interest here are Velez and Capra. They founded and controlled all three corporate entities, and they both signed an agreement to arbitrate their disputes related to the business of PCH, PSI and MTC.

In consideration for the opportunity to generate more revenues for PCH and its subsidiaries, they submitted themselves and the companies that they directly and/or indirectly control, to the jurisdiction of the NASD in exchange for the opportunity to make more money.

Velez and Capra are associated persons within the meaning of the Code, and on behalf of PCH, as its agent, as well as the majority shareholders owning 94% of the holding company, they demonstrated a clear and unequivocal intent to arbitrate claims with third party beneficiaries generally, <u>Armijo v. Prudential Insurance Co. of America</u>, 72 F.3d 793, 799 n. 7 (10th Cir. 1995) (finding an intent to arbitrate with Prudential (a member firm) as well as Pruco (a holding company) through the maintenance of registration with Prudential).

Moreover, it is clear from the text and purpose of Form U-4, that the parties to the agreement intended to benefit such non-signatory, third parties as PCH. While Form U-4 is only an agreement between the NASD and the individual parties here (both Velez and Capra, and PCH), it was adopted as a broader effort by the self-regulatory organizations, including the NASD, to regulate the securities industry. See 1 Ian R. MacNeil, et al., Federal Arbitration Law: Agreements,Awards, and Remedies under the Federal Arbitration Act Section(s)13, at 3-8, 43-44 (1996); Stephen J. Ware, Employment

Arbitration and Voluntary Consent, 25 Hofstra L.Rev. 83, 146 (1996). The intention, as Form U-4 unambiguously indicates, was not limited to arbitrating disputes between the NASD and the applicant or member "firms" explicitly recognized in the text. Rather, the arbitration agreement and the NASD Code of Arbitration establish certain classes of individuals — member firms of the NASD, customers, and so on — who would benefit from the applicant's agreement with the NASD. The applicant, in return, would become a registered person with the NASD and could then properly conduct business under the federal securities laws.

Therefore, there is no doubt that the parties to Form U-4 unequivocally intended that each applicant would submit to arbitration against non-signatory third parties such as PCH. A holding that would restrict the right of these third parties to invoke arbitration because they had not signed Form U-4 would essentially require the NASD and the applicants to seek explicit textual recognition of all intended beneficiaries, whether known or unknown. Such a requirement would frustrate the purpose and text of Form U-4 and accordingly PCH may properly seek enforcement of the arbitration clause against the plaintiffs.

<u>CONCLUSION</u>

In light of the foregoing, it is respectfully requested that the Court compel this controversy to arbitration before FINRA Dispute Resolution, who has already determined its compulsory nature under its Rules

Respectfully submitted,

Dated: October 30, 2007

s/Dan A. Druz
Dan A. Druz