UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

OLIVER L. VELEZ

        Plaintiff,

v.

PRISTINE CAPITAL HOLDINGS INC.,
GREG CAPRA, AND FINANCIAL INDUSTRY
REGULATORY AUTHORITY,

Defendants.

07-cv-08524 (AKH)

MEMORANDUM OF LAW
IN FURTHER SUPPORT OF
DEFENDANTS' MOTION TO
COMPEL ARBITRATION AND
IN OPPOSITION TO PLAINTIFF'S
MOTION FOR REMAND

Return date: January 15, 2008

---

Procedural and factual background

      Plaintiff Oliver L. Velez ("Velez" or "Plaintiff") was the CEO of Defendant

Pristine Capital Holdings Inc. ("PCH") until November of 2006 when a majority of the

company's shareholders relieved him of his executive duties for misconduct. When

Velez was removed, Defendant Greg Capra succeeded him as the CEO. Subsequently,

on February 21, 2007, PCH terminated Velez. Contemporaneous with his termination,

Velez became the head of a competitor firm.

      During his tenure as CEO, Velez had worked in PCH's White Plains, New York

office. In addition to the New York office, over the years, PCH has maintained offices in

Florida, California, Colorado and Nevada. The Miami, FL office has been open since

2000 / 2001.

      After Velez' departure in February 2007, there were no other executives of PCH

working out of the New York office, and the principal place of business was switched to

Florida, where it continued as of the date of the filing of this matter, and presently as well.

In fact, Defendant Greg Capra is a Florida citizen and resident, who, after becoming the CEO, began the process of moving PCH's principal place of business to the Florida office, which is currently located at 2333 Brickell Ave. Suite UL7, Miami, Florida. The change in location was completed in August, 2007, before the filing of the Notice of Removal in this case, on October 2, 2007. Also relevant to the instant motions of the parties, PCH is incorporated in Delaware.

PCH oversees and directs the business of its two subsidiaries: Pristine Services Inc. ("PSI"), which provides educational services to self-directed, active investors; and Pristine Securities LLC d/b/a Mastertrader.com ("MTC"), which is a broker-dealer and member firm of the Financial Industry Regulatory Authority ("FINRA", and also a nominal party in this matter, not considered for purposes of a determination of diversity jurisdiction), that provides on-line brokerage services to self-directed investors.

At its essence, the business of PCH, a holding company, in addition to the setting and approval of overall policy objectives for both subsidiaries, is the promotion of the cross-marketing strategy between the two companies, as detailed in Greg Capra's Certification in support of Defendants' Motion to Compel Arbitration filed on October 30, 2007.

On or about 08/27/07 Defendants PCH and Capra sued Velez by commencing an arbitration proceeding at FINRA Dispute Resolution Inc. (the securities industry's main arbitration facility). The suit alleged numerous claims of serious misconduct, including but not limited to, the conversion of $250,000.00 in corporate funds to his personal use;

unfair competition; and for the breach of a number of duties owed to PCH by Velez.

In his Certification attached to his Motion for Remand, Velez admits that in 2001 `he executed a 'U-4', which contains a 'pre-dispute arbitration clause' binding the parties to arbitrate their controversies. Previously, in 2003, Velez, Capra, PCH and its two subsidiaries ("the PCH arbitration claimants") availed themselves of the U-4 arbitration agreement in another securities industry controversy, in which they were Awarded more than $165,000.00. The PCH arbitration claimants, including Velez, accepted the Award, and cashed the check.

As noted, at the end of August, 2007, Defendants filed the FINRA arbitration proceeding against Velez. In response, on September 21, 2007, Velez filed in New York Supreme, County of New York, a Petition to Stay the Arbitration. On October 2, 2007, Defendants Capra and PCH filed a Notice of Removal and removed the matter to this court invoking its diversity and federal question jurisdiction, thereby mooting the Plaintiff's Petition to Stay Arbitration in the state court. On October 30, 2007, Defendants Capra and PCH moved this court to compel the matter to arbitration at FINRA.

On November 20, 2007, Velez responded to the Motion to Compel by moving the Court to remand the matter to the state court. The instant papers are filed by PCH and Capra in further support of their Motion to Compel, and in Opposition to Velez' Motion to Remand.

Argument
Opposition to Motion to Remand
Removal and Remand

Defendants PCH and Capra have invoked both the "diversity of citizenship" and "federal question" jurisdiction of this Court. Plaintiff opposes Defendants' removal of the case, and has moved the court to remand the matter to the state court.

The first argument advanced by Plaintiff in his Memorandum in support of his Motion for Remand is the alleged lack of complete diversity of citizenship by the opposing parties. In support thereof, Plaintiff alleges that PCH's primary place of business is in White Plains, New York. However, **this allegation is absolutely factually incorrect.** Before his departure from PCH in February, 2007, Velez was PCH's CEO. He has lived in White Plains for many years, and consequently, Velez located PCH's principal place of business there for his own convenience.

With Velez departure from the firm in February, 2007, however, there was no longer any reason to continue to have the principal place of business in that location. Indeed, as there were no other PCH executives who had worked there since 2003, it was impossible. PCH's CEO and three Vice-Presidents, and its operations are scattered around the United States – in Florida, Colorado, Nevada, California and New York. As none of the three vice-presidents work in White Plains, New York, and the new CEO, Capra, is located in Florida, he completed moving the principal place of business to PCH's Miami location at or about the end of August, 2007.

As set forth in Capra's Certification filed on October 30, 2007, annexed to Defendants' Motion to Compel, PCH is the holding company for two firms focusing on the education of investors, and providing brokerage services. Due to the requirement in

4

2001 of Velez' and Capra's registration with the NASD (n/k/a FINRA), and their explicit agreement with the regulator (also detailed in Capra's Certification filed on October 30, 2007), all three companies – PCH, PSI and MTC – are subject to the jurisdiction of NASD (n/k/a FINRA) Regulation Inc., and both Capra and Velez became licensed and executed U-4s – the very same document that binds the parties here to arbitrate their controversies.

As a participant in a service industry, PCH's products are driven by the ideas of its senior executives.  Capra writes much of the content that is distributed at the educational seminars that are presented nationally, and also distributed worldwide via DVD and over the internet.  He performs these functions from PCH's Miami office and his home in Florida; and he and other PCH employees then present seminars all over the country.

As the CEO, he is also responsible for creating and implementing overall company policy and for approving all executive decisions related to the education subsidiary, and the cross-marketing between the subsidiaries.  In sum, wherever Capra is located, is the "nerve center" of this widely scattered national service company.  About ninety percent of the time he works from Miami.  Indeed, by the end of 2007, he will have visited the White Plains, New York office only five days during the entire year – a mere 2% of his business days worked.  Most of the balance of the year he spends in Florida, with the rest of his time concentrated on conducting seminars and visiting the other PCH executives, located out West.

Another of PCH's senior executives is also located in Miami, Florida.  Jaime Annexy is licensed by FINRA, and the President of the broker-dealer.  He is responsible

5

for all executive decisions related to that subsidiary company. He is also an executive of PCH, and works closely with Capra to find ways to best exploit the synergistic relationship between the two subsidiaries. He too is a citizen of Florida, also works from PCH's office in Miami, and occasionally from his home in Miami as well.

To reiterate, no Vice-President nor the CEO, works out of the White Plains, NY office, which houses PCH employees who perform back office and support functions only, for all three PCH firms.

The Date of The Filing of the Federal Action is Critical

Velez incorrectly contends that the principal place of business of PCH is still located in White Plains, despite his having left the firm almost a year ago and having no personal knowledge of this fact presently. In support of his inaccurate contention, he refers to the pleadings in other, related lawsuits, one before the federal district court and another at the FINRA arbitration facility, where Defendants alleged that the principal place of business was located in White Plains, as well as earlier filings with the Secretary of State.

Indeed, those statements were true at the time of the filings of the cases, and with the Secretary of State of New York in 2000, but of course, it is the location of the principal place of business on the date of the Notice of Removal on October 2, 2007 that controls, and on that date, and for at least a month prior thereto, the move of the principal place of business from White Plains to Miami, Florida had been completed. [1]

---

[1]         The date of the filing of the federal lawsuit (07 cv 5720), referenced by Velez in his Motion for Remand was filed by PCH against Velez and others, on June 15, 2007, seeking a TRO to restrain Velez from engaging in false advertising and unfair competition. The parties' counsel appeared before Judge William H. Pauley DCJ and in the hearing, Judge Pauley urged PCH in colloquy to either bolster by amended complaint, the federal claims alleged, or to withdraw the pleading and consider re-filing in State Court, with emphasis on the many state claims (the judge was unaware of the arbitration agreement) in the Complaint. PCH's application for a TRO, and Velez' Motion for fees based upon alleged frivolity were denied, and Judge Pauley directed PCH's counsel to either draft a scheduling order or dismiss the matter. He rendered no other decision. Upon further consideration, on June 30, 2007, PCH filed a Notice of Dismissal of the complaint pursuant to F.R.C.P. 41, and instead, next filed the suit at FINRA Dispute Resolution Inc. in New York on or about August 27, 2007, where it is presently venued, and has since become the subject of Velez' Petition to Stay in State Court.

It is black letter law that "the [date of the] commencement of this action [is] the critical time for assessing citizenship for purposes of diversity." Phoenix Four, Inc. v. Strategic Resources Corporation, *Phoenix Four, Inc. v. Strategic Res. Corp.*, No. 05 Civ. 4837, 2006 U.S. Dist. LEXIS 52402, at 12, 13 (S.D.N.Y. Aug 1, 2006).

In the present case, the critical date was October 2, 2007, the date of the filing of the Notice of Removal, at which time the principal place of business of PCH was located in Miami, FL.

Determining Principal Place of Business

As the court opines in Phoenix Four, Inc. v. Strategic Res. Corp., No. 05 Civ. 4837, 2006 U.S. Dist. LEXIS 52402, (S.D.N.Y. Aug 1, 2006):

> "In this Circuit, two tests are commonly employed to determine a corporation's principal place of business. See Augienello v. Fed. Deposit Ins. Corp., 310 F. Supp. 2d 582, 590 (S.D.N.Y. 2004). The "nerve center" test defines the principal place of business as "the nerve center from which [a corporation] radiates out to its constituent parts and from which its officers direct, control and coordinate all activities without regard to locale, in the furtherance of the corporate objective." Scot Typewriter Co. v. Underwood Corp., 170 F. Supp. 862, 865 (S.D.N.Y. 1959). Under this test, courts "focus on those factors that identify the place where the corporation's overall policy originates." Augienello, 310 F. Supp. 2d at 590 (citing R.G. Barry Corp. v. Mushroom Makers, Inc., 612 F.2d 651, 655 (2d Cir. 1979)). The other test has been labeled the "place of operations" or "locus of operations" test. There, the effort is to identify the place in which a corporation conducts its principal operations. See R.G. Barry Corp., 612 F.2d at 655. Courts generally apply the "nerve center" test when a corporation's operations are geographically widespread, and the "locus of operations" test when a corporation is centralized. See Augienello, 310 F. Supp. 2d at 590-91.

> "Regardless of which is the more appropriate test, and they are much the same, the case law makes it clear that judges should not be 'straightjacketed' by the formal requirements of each test,"but rather should adapt the tests to the facts of each case. Refco Props., Inc. v. Trump, No. 94 Civ. 2124, 1995 WL 412423, at *8 (S.D.N.Y. July 12,

1995). A flexible approach is appropriate where the facts do not fall neatly within the parameters of either the "nerve center" or the "locus of operations" analysis.'" <u>Phoenix Four</u> at 11, 12.

In this case, the "nerve center" analysis is appropriate. PCH's products and services are distributed nationally, holding seminars all over the country and distributing product worldwide over the internet; there is no centralized "locus of operations". However, the chief executive officer and another executive, the President of one of the two subsidiaries, are both located in Miami, Florida. The other Vice-Presidents are in California and Colorado. No executive decisions regarding this service industry company emanate from New York. Virtually all of the policy making, and the key operational decisions, are made in Florida.

To reiterate, CEO Capra, in 2007, was in the New York office during five days only. (See Capra Certification attached hereto) Approximately ninety-percent of his time was spent in Miami, with the balance at various venues around the country, conducting seminars or visiting with other company executives, located out West. Further, the day to day business of PCH was, and is, run from the Miami office by Capra and Annexy.

It is true that PCH's payroll and financial records are maintained in the New York office, but, as in the <u>Phoenix</u> case, "[t]hese financial functions [are] collateral to the corporation's main function…" *Id.*, 13, which is the promotion of cross-marketing between the two subsidiaries.

A fair amount of the work of the broker-dealer subsidiary is also conducted in New York, but "efforts related to … subsidiaries… may not be imputed to … ascertain [the citizenship of the parent]." *Id.*

Unsupported by any verified facts in an affidavit or similar sworn statement, Velez also states in his Memorandum of Law that Capra lives in New York (a completely false and unsupportable statement), and that PCH's principal place of business is located there as well.  Without verification, the Court is left to guess why this was supposedly so as of October 2, 2007, the date of the filing of the Notice of Removal, as no evidence of these conclusory statements are offered by Velez.

Also not supported by a sworn statement, Velez' Memorandum of Law mischaracterizes the nature of a public document issued by the N.Y. Department of State, Division of Corporations (Exh. 7 included with Velez' motion papers.)  The document notes that PCH is a "foreign business corporation", which is true; that the initial filing was made on July 28, 2000, which is also true; that its "Principal Executive Office" was located in White Plains at the time of filing in 2000, also true; and that Oliver L. Velez, the Plaintiff herein, was the "Principal Executive Officer" at the time of the 2000 filing of the document, which is also correct.  None of those facts, however, establishes PCH's principal place of business on October 2, 2007, the date of the filing of the Notice of Removal.

Velez' confusion regarding the meaning of the term "principal place of business" continues throughout his Memorandum and is a fatal flaw in his reasoning.  Under the federal rules, there can be only <u>one</u> principal place of business, but in his papers, at page "12" thereof, Velez refers to PCH having "<u>a</u> principal place of business in New York" inferring incorrectly that there may be other such "principal places of business" elsewhere.  He then follows this feckless argument with a corollary mistake as to Capra, stating that because "….Capra <u>conducts business</u> in the State of New York in

his capacity as President and CEO of Pristine Capital, therefore there is no diversity to warrant removal to the federal court." Of course, it is the state citizenship of an individual, and the unique and exclusive "principal place of business" of a corporation, along with its state of incorporation, that controls under the diversity statute, not where one "conducts business" occasionally.

As stated by the court in Bailey v. Grand Trunk Lines New England 805 F.2d 1097, 1100 (2nd Cir. 1986): "Such an approach ignores the plain meaning of the concept of a *principal* place of business and is at odds with the overwhelming consensus of authority that a corporation may have only one principal place of business. *E.g., United States Fidelity & Guaranty Co. v. DiMassa,* 561 F.Supp. 348, 351 n. 8 (E.D.Pa. 1983), *aff'd mem.,* 734 F.2d 3 (3d Cir. 1984); *Wood-bridge Plastics, Inc. v. Borden, Inc.,* 473 F.Supp. 218, 223 (S.D.N.Y.), *aff'd mem.,* 614 F.2d 1293 (2d Cir. 1979); 13B C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3624, at 611 (1984); 1 J. Moore, *Moore's Federal Practice* ¶ 0.77[3.1], at 717.60 (1986).    (Underscored emphasis added; italics in original.)

Velez also perplexingly applies the concept of *in personam* jurisdiction by the State of New York in a manner that completely baffles the Defendants, further relying on the unsworn "fact" that Capra is a "New York person", the materiality of which is confoundingly unclear.

Federal Question Jurisdiction

In addition to "diversity of citizenship" jurisdiction, this matter also properly comes before this court pursuant to the federal securities laws.

To summarize the arguments previously set forth in the Memorandum of Law in support of Defendants' Motion to Compel to Arbitration, in his complaint before the Supreme Court of New York, Velez' argues at great length, as well as in his pleadings, that the Defendants have utilized documents, and manipulated rules of FINRA.  Having emphasized Plaintiff's connection to federal securities regulation and the federal regulatory scheme by which the SEC and FINRA monitor member firm conduct, and compliance with the federal securities laws, it is surprising that Plaintiff then denies the existence of a federal question here (*See*, e.g., Velez' Verified Complaint: ¶¶ "2", "3", "5", "12", "13", "14", "15", "16", "17", "18", "19", [and the second] ¶ "20", footnotes "1", "2", "3" and "4", and Exhibits "1" and "2" annexed thereto).

Agreement to Arbitrate

In opposition to the Motion to Compel Arbitration, Plaintiff alleges that by his termination, and the concomitant filing of the "U-5", he is no longer subject to the arbitration agreement contained in the U-4.

Defendants' arguments are more expansively set forth in their Memorandum of Law in support of the Motion to Compel Arbitration, pursuant to the Federal Arbitration Act and the case law interpreting.  They may be summarized briefly as follows: the U-4, contains an agreement to arbitrate controversies between and among members and individuals duly licensed in the securities industry.  The binding nature of the agreement is not limited to its signatories Barrowclough v. Kidder, Peabody & Co., Inc., 752 F.2d 923, 938 (1985); but based upon the parties' intentions, determined pursuant to principles of contract interpretation, Kaplan v. First Options of Chicago, Inc., 19 F.3d 1503, 1512 (3d Cir. 1994).  Further, the agreement to arbitrate does not terminate when the signatory

terminates his association with a member firm, O'Neel v. Nat'l Ass'n of Secs. Dealers, Inc., 667 F.2d 804, 806 - 807, notwithstanding Velez' unavailing protests to the contrary.

Further, Defendants reiterate that Velez, PCH and Capra all previously invoked the arbitration agreement in a prior dispute heard before an NASD Panel, in which they were awarded $388,000.00 (offset by an Award on a counterclaim, netting them nearly $170,000.00, as set forth in Capra's Certification filed October 30, 2007).  Plaintiff's Memorandum is strikingly silent in its lack of a response to this point.

Counsel fees

In the unlikely event that Plaintiff prevails on their motion for remand, the issue of fees would arise.

First, it is not automatic that a successful motion for remand results in an award of fees to the prevailing party.  The language of 28 U.S.C. § 1447(c) leaves that determination to the discretion of the court:

> "[B]ad faith removal, although often considered, is not required in order to award costs and attorney fees." Frontier Ins. Co. v. MTN Owner Trust (S.D.N.Y. 2000) 111 F. Supp.2d 376, 381. Rather, "[w]e must apply a test of 'overall fairness given the nature of the case, the circumstances of the remand, and the effect on the parties.'" Id. (quoting Morgan Guaranty Trust Co. of New York v. Republic of Palau (2d Cir. 1992) 971 F.2d 917, 923-924); see also United Mutual Houses. L.P.,230 F. Supp.2d at 355.  Wilds v. United Parcel Service, Inc.,(S.D.N.Y. 2003) 262 F. Supp.2d 163, 184
>
> Nonetheless, this provision "leaves the decision to award such [fees] to the Court's discretion, and courts frequently decline to do so. United Mutual Houses. L.P. v. Andujar (S.D.N.Y. 2002) 230 F. Supp.2d 349, 354;184

Plaintiff neither explicitly set forth any test for determination by this court of its fee motion, nor any verified facts to support a determination of bad faith, or unfairness.

From this paucity of factual and legal support for the motion for fees, this Court may infer that none exists.

Also, Velez' attorneys fees are so inflated, that they should be rejected on their face. The best example of their ridiculously bloated nature may be found at Exh. "8" attached to Plaintiff's "Schedule of Billable Hours" wherein Attorney Ogele lists hours of charges at $400.00 an hour for such menial tasks as "arranging papers in binders", "scanning", and riding in a taxi cab.

Indeed, the total amount that the undersigned has billed Defendants for his substantive work on the same motions – about $6000.00 – is 80% less than the $30,000.00 amount billed Plaintiff by Attorney Ogele, and even less than the amount billed Plaintiffs just for completing such unskilled, clerical tasks as collating and hole punching documents, and the time spent riding to the courthouse.

Accordingly, and in light of these gross fee and cost exaggerations, Defendant respectfully asks the court, to draw the appropriate inferences as to the actual value and accuracy of the "substantive" legal work allegedly performed by Plaintiff's counsel here, as well; and respectfully suggests that the purpose of the motion for fees is more grounded in greed, than in a reasonable need for justified compensation of the Plaintiff based upon any standard, or the protection of plaintiffs generally, from illicit, ill-conceived notices of removal.

Finally, as set forth in the undersigned's Declaration, although Plaintiff alleges that the removal to federal court has delayed and prejudiced Plaintiff's position, it is the undersigned's experience that final determinations by New York Supreme in Manhattan, are many times slower than similar motions in federal court, and therefore the removal to

13

federal court will actually expedite the matter. Further, it is the Plaintiff who is

attempting to delay adjudication of the substantive controversy by holding it up in state

court, when black letter law in every U.S. jurisdiction, be it state or federal, directs that

the matter should be heard in arbitration at FINRA.

Conclusion

In the light of the foregoing, Defendants respectfully request that Plaintiffs'

Motion for Remand to the state court be denied, and that this matter be compelled to

arbitration before a panel of FINRA arbitrators, FINRA Case No. 07-02396, and which

was filed there on or about August 27, 2007.


Dated:    12/17/07

s/ Dan A. Druz
Dan A. Druz (DD6177)
Attorney for Defendants
291 E. Main St., Suite 1000
Manasquan, NJ 08736
Tel: (732) 223-7676
Fax: (732) 223-1592
Cell: (732) 822-1052
dandruzesq@aol.com